[Civ. No. 25911. First Dist., Div. Four. Apr. 29, 1970.]

CHASE BRASS AND COPPER CO., INCORPORATED,
Plaintiff and Respondent, v.
FRANCHISE TAX BOARD, Defendant and Appellant.

498

**Counsel**

Thomas C. Lynch, Attorney General, Ernest P. Goodman, Assistant Attorney General, and John J. Klee, Jr., Deputy Attorney General, for Defendant and Appellant.

Valentine Brookes, Charles S. Franklin and Kent, Brookes & Anderson for Plaintiff and Respondent.

**Opinion**

**DEVINE, P. J.**—Franchise Tax Board of the State of California (herein, the Board) appeals from a portion of a judgment in the amount of $231,257.32 plus interest, which was awarded to plaintiff in this lawsuit to recover taxes paid under protest. The taxes are upon the franchise to do business in California during the years 1954, 1955 and 1956; but in order to make the reading easier, operations and relationships among companies are sometimes narrated, in this opinion, in the present tense.

Plaintiff, Chase Brass and Copper Co., Incorporated, is a wholly owned subsidiary of Kennecott Copper Corporation. The principal question is whether plaintiff's business is unitary or nonunitary with Kennecott, and a lesser question is whether plaintiff's business is unitary with any of Kennecott's other subsidiary corporations. If the business be unitary, a much

larger franchise tax would be imposed than if the business be nonunitary. It is not always unfavorable as to tax for a corporation to conduct a unitary business; for example, in the leading cases of *Superior Oil Co.* v. *Franchise Tax Board,* 60 Cal.2d 406 [34 Cal.Rptr. 545, 386 P.2d 33], and *Honolulu Oil Corp.* v. *Franchise Tax Board,* 60 Cal.2d 417 [34 Cal.Rptr. 552, 386 P.2d 40], the corporations asserted, successfully, that their California operations were unitary with those conducted outside the state.

In the case before us, plaintiff computed its California income, using an allocation formula which is applied to nonunitary enterprises and which takes into account sales, property and payroll within the state as compared with those existing outside. The Board disagrees with this method of computation; it has assessed taxes at a much higher figure on the "unitary business" theory.

### The Corporations

The parent is Kennecott Copper Corporation (called Kennecott herein), the nation's largest producer of copper, a New York corporation. It does no business in California. It mines, smelts and refines copper, gold, silver and molybdenite. The metals are mined in Utah, Nevada, Arizona and New Mexico. Metals other than copper are sold in operations completely unrelated to plaintiff. Copper is not fabricated by Kennecott, but is sold through a subsidiary of Kennecott, Kennecott Sales Corporation.

Braden Copper Company, a Maine corporation, wholly owned by Kennecott, operates mines in Chile. Ordinarily, it sold copper to the government of Chile and to purchasers in the world market, but not to buyers in the United States. In the years relevant hereto, however, because of shortages, it did sell, through Kennecott Sales Corporation, in this country. Plaintiff was a buyer. Braden does not fabricate; it sells fungible copper.

Bear Creek Mining Company, a Delaware corporation, owned by Kennecott, explored for metals in California in the relevant years, but made no significant discoveries. It is the third company in the mining group consisting of Kennecott, Braden, Bear Creek.

The procedure beyond mining and refining of copper, sales, is committed to Kennecott Sales Corporation (herein, Kennecott Sales), a New York corporation, wholly owned by Kennecott, which in 1934 took over the sales and activity theretofore assigned by Kennecott and Braden to an independent agency. The sale of copper by Kennecott and by Braden within the United States is done by Kennecott Sales. No sales are made in California; Kennecott does no business here. Its sales of copper which enters this state are completed elsewhere. Kennecott Sales charges Kennecott a commission on the sales.

Kennecott Wire and Cable Co. (herein Kennecott Wire), a Rhode Island corporation, owned by Kennecott, manufactures copper rod, wire and cable for transmission of electricity. It uses refined primary copper, all of which it buys from Kennecott or Braden through Kennecott Sales. Its sales operation in California is largely through plaintiff. Kennecott Wire did not do business in California in the relevant years.

Finally, there is plaintiff, Chase Brass and Copper Co., Incorporated, a Connecticut corporation, wholly owned by Kennecott. Like Kennecott Wire, it is a manufacturer. Its products are brass (made of copper and zinc), bronze (copper and alloys, mostly tin), and copper rod, sheet, wire and tube. The manufacture is done entirely outside California. Copper is bought from Kennecott Sales, derived from Kennecott and Braden, to the extent of 80 to 84 percent of Chase's needed supply. Within California, Chase warehouses and sells its products and those of Kennecott Wire.

### The Franchise Tax Law

■ When a corporation engages in multistate business, including business in California, and the business is unitary, there must be an allocation of income by formula. Separate accounting is not allowable, although it is usable for a corporation which, by operating here and elsewhere, conducts a nonunitary business. In the case of Chase itself, it was always recognized by the company that its own business is unitary, wherefore its own computation of the franchise tax was done according to formula. But the Board contends that the geographic unitary character of Chase is not all that is to be considered; there must also be taken into account the whole intercorporate parentage and affiliation of the Kennecott family. Mainly, it is the vertical aspect which is put before us: the relationship of Chase to Kennecott Sales, to Braden and to Kennecott. Secondarily, there is to be considered the horizontal relationship of Chase to Kennecott Wire.

■ Intercorporate unitary character of business, in which the activities of the parent are considered, under an appropriate factual situation, is a valid concept for taxing purposes. (*Edison Cal. Stores, Inc.* v. *McColgan,* 30 Cal.2d 472 [183 P.2d 16].) This holding of the *Edison Stores* case was but a logical sequence of the holding in *Butler Bros.* v. *McColgan,* 17 Cal.2d 664 [111 P.2d 334], in which a single company had operated through wholly controlled branches. In both cases, there were strong and embracing central controls. ■ The general test which we are to apply is this: "If the operation of the portion of the business done within the state is dependent upon or contributes to the operation of the business without the state, the operations are unitary." (*Edison Cal. Stores* v. *McColgan, supra,* at p. 481;

*Superior Oil Co.* v. *Franchise Tax Board,* 60 Cal.2d 406, 412 [34 Cal.Rptr. 545, 386 P.2d 33].) ██ A more particular statement of the test is that a business is unitary if these circumstances are present: "(1) Unity of ownership; (2) Unity of operation as evidenced by central purchasing, advertising, accounting and management divisions; and (3) unity of use of its centralized executive force and general system of operation." (*Butler Bros.* v. *McColgan, supra,* at p. 678; *Superior Oil Co.* v. *Franchise Tax Board, supra,* at p. 412.)

██ In applying these tests, we are considering a question of law only, because the facts, as placed before the trial court and before us, consist of a lengthy stipulation between the parties and some uncontradicted testimony. We must, therefore, make our own judgment on the question of law, and we cannot rest upon findings of fact made by the trial judge. (*Standard Register Co.* v. *Franchise Tax Board,* 259 Cal.App.2d 125, 129-130 [66 Cal.Rptr. 803]; *Household Finance Corp.* v. *Franchise Tax Board,* 230 Cal.App.2d 926, 930 [41 Cal.Rptr. 565]; *Montgomery Ward & Co.* v. *State Board of Equalization,* 272 Cal.App.2d 728, 733-734 [78 Cal.Rptr. 373]. See also *RKO Teleradio Pictures, Inc.* v. *Franchise Tax Board,* 246 Cal.App.2d 812, 816 [55 Cal.Rptr. 299]; *Superior Oil Co.* v. *Franchise Tax Board,* 60 Cal.2d 406, 413 [34 Cal.Rptr. 545, 386 P.2d 33].)

### Unity of Ownership

As is usual in disputes of this kind, ownership of one corporation by another is present. This means, of course, that the owner (its stockholders and directors) expects, or at least hopes, that its subidiary will make a profit. But more is required for a business to be unitary, that is, fulfilment of the other two tests.

### Unity of Operation

Although there is not a clear demarcation between what is "operation" and what is "use," in general it may be said that the acts falling within the category of "operation" are the staff functions, and those within "use" are the line functions.

The staff functions of a vertically integrated enterprise probably are not so markedly unitary as they are in a horizontally integrated business. This is so because, in the case of horizontal integration, functions such as central control of advertising of the same product, central purchasing, and the like are designed to give advantages to the business despite geographic differences. In the case of vertical integration involving various steps in the pro-

duction and distribution, integration of staff functions probably will be considerably less. Nevertheless, when we consider each of the functions of Chase coming under the heading "Unity of Operation," in connection with those of its parent, Kennecott, we find considerable cooperation.

*Purchasing:* Under this heading, we consider the buying of items other than the purchase of copper, because copper buying is an essential "line" function. As to the auxiliary supplies, it is stipulated that Chase had its own purchasing department staffed by its own personnel. But Kennecott does some "minor" purchasing for Chase. In some instances, insurance was purchased for two or more companies in order to obtain a more favorable rate or better coverage or a better spread of risk. There was no intercompany coverage on basic industrial policies such as fire, fire use and occupancy, workmen's compensation, public liability, automobile liability and fire, sickness and accident, hospitalization and surgical, and certain types of bonds.

*Advertising:* Chase maintains its own advertising program and budget. The name and trademark of Chase are predominant in its advertisements, but these often contain a statement that Chase is a subsidiary of Kennecott. When Chase places advertising through an advertising agency, it uses the same agency that is used by Kennecott.

*Accounting:* Kennecott and Chase keep separate books of account, but the two use the same accounting firm. Kennecott prepared consolidated tax accounts for Chase.

*Legal:* Chase has its own legal staff and on occasion employs its own outside counsel. Presentation of the protest of Chase before the Franchise Tax Board in these proceedings was handled by Kennecott employees.

*Financing:* In 1955, Chase's mill at Waterbury, Connecticut, was severely damaged by flood. Kennecott made loans to Chase, in the amount of $10,000,000, for rehabilitation of the plant. The prime bank rate of interest, which was then 3½ percent, was charged. The loan, including interest, was repaid within four years. We find this to be substantial evidence of unity of operation. It may be that Chase could have borrowed the money from lending institutions, but the fact remains that it could turn readily to its parent for help. It must have been deemed advantageous to the over-all management to have handled the transaction in this way, otherwise a separate arrangement would have been made.

*Retirement Plan:* There is a common retirement plan for salaried employ-

ees, which is administered by Kennecott, because when it was installed it appeared to be more economical and because it assures salaried employees in each company the same treatment as those in other Kennecott companies.

## Unity of Use

Unity of use relates to executive forces and operational systems. (*Superior Oil Co.* v. *Franchise Tax Board,* 60 Cal.2d 406, 415 [34 Cal.Rptr. 545, 386 P.2d 33].)

■ *Executive Forces:* The integration of executive forces is an element of exceeding importance. It is top level management which is credited (or, in case of failure or indifferent results, debited) with the effects of corporate enterprises. Chief executives of large organizations are regarded as highly prized acquisitions. They are induced to join a corporation, or to remain with it, and to exert their best efforts, not only by generous salaries, but also in many cases by incentive plans of various kinds. For a subsidiary corporation to have the assistance and direction of high executive authority of such a corporation as Kennecott is an invaluable resource. The stipulation of facts reads: "The day to day operations of the subsidiaries were the concern of the executives of the subsidiaries and were handled by various subordinate employees of the subsidiaries. The Board of Directors of Kennecott was primarily interested in, and devoted the majority of its time to, the larger problems facing the copper industry in general, including the development and maintenance of its fabricating subsidiaries. The President of Kennecott was concerned with basic problems and policies of the subsidiaries. The executives of the subsidiaries reported to the President of Kennecott with respect to major policy matters." The "major policy matters" are what count in our estimation of integration. Day to day operations are made at various levels by many executives in any organization. They are made, no doubt, by a multitude of officials of Kennecott and its subsidiaries. Major policy is another thing. This was the concern of Kennecott.

Not only was there opportunity for control at the highest levels. The salaries of Chase's executives (and of those of Kennecott Wire) who earned more than $15,000 a year were subject to review by Kennecott. Exercising regulation of salaries of Chase's executives, even of those who were compensated at a not particularly sizable figure, Kennecott could control costs of management. Besides, these executives could hardly fail to recognize that their compensation was dependent upon the decision of Kennecott's salary committee.

It is true that the president of Chase had a complete staff and line organization under his direction, but executive control at the highest level was in Kennecott.

 *Chase and Kennecott Wire:* Inextricably bound to Chase's vertical relationship with Kennecott is its horizontal tie with Kennecott Wire. In fact, the relationships between Chase and Kennecott Wire, described in this paragraph, are evidence of the central control of these sibling corporations by their parent, Kennecott. Who would decide the extent of the horizontal relationships and whether the joint activities were mutually advantageous to the siblings, and commonly so to the parent, but the parent itself? Kennecott Wire, like Chase, is a manufacturer. Since 1944, Chase has taken over the sales of the major part of the products of Kennecott Wire. Chase warehouses the products of Kennecott Wire; Chase salesmen call on prospective wire and copper customers. If the salesmen obtain orders, they send them to Kennecott Wire. The orders are filled and shipped in the name of Chase. Chase receives a discount on the products sold. Chase does much of the accounting and reviews the taxes for Kennecott Wire. The former president and the general sales manager of Kennecott Wire had been Chase employees. Although the products, all of them composed to some extent of copper, are different, the activities clearly show a unitary business. (*RKO Teleradio Pictures, Inc.* v. *Franchise Tax Board,* 246 Cal.App.2d 812 [55 Cal.Rptr. 299].) Respondent argues that unity of ownership is absent. In form this is correct, but in substance the unity of ownership is present because Kennecott is the sole owner of Chase and of Kennecott Wire.

*Purchase of Copper:* Kennecott sells about 20 percent of its total copper production to Chase through Kennecott Sales. During the relevant years, there was an industry-wide copper shortage so that Kennecott would have had no difficulty in selling copper to others. This does not mean, however, that there was no contribution at all to Kennecott by Chase except the profits which Chase might make and which would redound to the benefit of Kennecott as sole stockholder. Although the three years, 1954, 1955 and 1956, are the only ones involved in the present case, these years are not the only ones in which the two corporations have been interested for their anticipated prosperity. Chase has been owned by Kennecott since 1929. To have a buyer of a substantial portion of the parent's production throughout the years must be assumed to be an advantage.

It is the position of respondent that Chase gained no particular advantage during the years in question by reason of the parentage of Kennecott. Kennecott sold to Chase at exactly the same price as that which it charged Chase's competitors. Moreover, during the period of shortage an allocation was made based on prior sales. Respondent does not contend that price equality was the result of benevolence toward other consumers, including competing companies. The equality was under compulsion of the Robinson-Patman Act (15 U.S.C. § 13a). But it is argued that under these conditions

Chase is no more unitary with Kennecott than is, for example, another large buyer from Kennecott, Revere Copper & Brass Company. Here, again, however, we remark that the three years are not the only ones to be considered. The percentage which governed the amount of copper allocable to Chase was built over the years.

 The fact of the sales alone, however, whether specially advantageous to Kennecott or to Chase, does not determine the business to be unitary. The factors described under headings above, and particularly those relating to control of major policy, together with the subject of sales, bring us to the conclusion that the business among Kennecott, Kennecott Sales and Chase is unitary.

 Except for the matter of sales and joint ownership, Braden and Chase are not unitary. We support the conclusion of the trial judge to this extent. As to Bear Creek, too, there is no such relationship as would allow formula computation of the taxes on the unitary theory. We agree with respondent on another point, namely, that Kennecott's sales of gold, silver and molybdenite metals, which are not bought by Chase or Kennecott Wire, are not part of the unitary business. The fact that these metals come from the same ore as that which produces copper is not sufficient to cause their sales to be included in the computations which are to follow.

The Board concedes that there is error in the property factor as it was applied, because of the decision in *McDonnell Douglas Corp.* v. *Franchise Tax Board,* 69 Cal.2d 506 [72 Cal.Rptr. 465, 446 P.2d 313]; wherefore, the case must be remanded in any event. Our decision requires further revisions of the formula.

We reverse the judgment, with directions to the trial court to proceed in accordance with this opinion.

Rattigan, J., and Christian, J., concurred.

A petition for rehearing was denied May 27, 1970, and the following opinion then rendered:

**THE COURT.**—This is in response to requests by the parties for further rulings and explanation:

 1. The formulary taxation procedure is not in itself a simultaneous process of taxing and of disregarding the separate entity of the taxed corporation. (*Edison California Stores* v. *McColgan,* 30 Cal.2d 472, 481 [183 P.2d 16].)

2. We do not regard the case of *Norfolk & Western Ry. Co.* v. *Missouri State Tax Com.*, 390 U.S. 317 [19 L.Ed.2d 1201, 88 S.Ct. 995], to be decisive or even relevant to the case at hand. In the *Norfolk* case, the railroad was able to show, by actual count of its rolling stock on the lien date, that the number of units within Missouri was substantially less than that which had been assumed by the taxing authorities, and that a certain "enhanced value" theory proposed by the taxing authorities would require a challenge to a total value figure which had been agreed upon. The case is far removed from the present one, wherein the operations of the corporations are unitary and separate accounting is not permitted.

3. Since the formula must be recomputed, the special issues relating thereto, which our opinion has not resolved, are to be presented to and tried by the trial court (the subject of the gold, silver and molybdenum operations, however, has been decided by our opinion).

Respondent's petition for a hearing by the Supreme Court was denied June 24, 1970.