[Civ. No. 48990. First Dist., Div. Four. Apr. 14, 1981.]

CONTAINER CORPORATION OF AMERICA, Plaintiff and Appellant, v.
FRANCHISE TAX BOARD, Defendant and Respondent.

COUNSEL

Franklin C. Latcham, Prentiss Willson, Jr., Thomas H. Steele and Morrison & Foerster for Plaintiff and Appellant.

George Deukmejian, Attorney General, Arthur de Goede and Neal J. Gobar, Deputy Attorneys General, for Defendant and Respondent.

OPINION

**CHRISTIAN, J.**—Container Corporation of America appeals from a judgment denying partial refund of corporation franchise taxes paid for the income years 1963, 1964 and 1965. We affirm the judgment.

The question is whether, under stipulated facts, appellant was properly treated as deriving income from sources both within and outside

California (Rev. & Tax. Code, § 25101)[1] on the basis that appellant and its foreign subsidiaries constituted a unitary enterprise.

Appellant, a Delaware corporation headquartered in Chicago, is engaged in the production and distribution of paperboard packaging materials. Appellant is subject to corporation franchise taxes on its activities in California. During the disputed tax years, appellant controlled 20 subsidiaries in Western Europe and Latin America. All these subsidiaries except one were engaged in the paperboard packaging business.

Appellant has assigned responsibility for its United States operations to regional vice presidents, each responsible for corporate operations in his area. This same policy of decentralization was followed in setting up the foreign subsidiaries. Appellant's first foreign operation was established in Colombia in 1944. The Colombian group directed legal work, selected and trained personnel, and promoted local sales; the parent corporation managed the technical and financial aspects of the business and supplied some equipment and raw materials. All the foreign subsidiaries were managed predominately by local citizens. Self-reliance by the subsidiaries was encouraged.

During the years in question, 38 of appellant's approximately 13,400 employees were assigned to foreign subsidiaries; some other employees of appellant were transferred to foreign subsidiaries and were no longer on appellant's payroll. Appellant had no special aim of transferring employees to the foreign subsidiaries. Such transfers generally responded to a specific need of a subsidiary. If the subsidiary requested assistance from appellant in finding a person with particular qualifications, appellant might suggest one of its own employees. Employees transferred to foreign subsidiaries usually continued to draw some pay from appellant, and fringe benefits except participation in appellant's stock bonus plan were continued even after transfer. Language and cultural differences, and a perceived need to present an acceptable local image, did substan-

[1]Revenue and Taxation Code section 25101 for the period in question provided in part: "When the income of a taxpayer subject to the tax imposed under this part is derived from or attributable to sources both within and without the State, the tax shall be measured by the net income derived from or attributable to sources within this State .... Income attributable to isolated or occasional transactions in states or countries in which the taxpayer is not doing business shall be allocated to the state in which the taxpayer has its principal place of business or commercial domicile." (Stats. 1957, ch. 2097, § 1, p. 3721.)

tially inhibit transfer of employees from the parent corporation to the foreign subsidiaries.

Only three of appellant's executives dealt regularly with the foreign subsidiaries. Local employees were in day-to-day control, but all important moves of the subsidiaries were subject to review by appellant's management. Appellant and its foreign subsidiaries usually reached decisions by mutual consent, but appellant held local management responsible for the performance of foreign subsidiaries. Appellant was represented on the board of directors of most of the subsidiaries.

There was no regular program for training in the United States of employees of foreign subsidiaries. But 10 or 12 times a year a foreign employee came to the United States for several weeks to learn appellant's operations. The foreign subsidiaries paid the cost of these visits.

Appellant made loans to its subsidiaries totaling $7,704,987, $7,155,714 and $3,223,371, for the three disputed years. The subsidiaries also borrowed from local sources; appellant guaranteed approximately one-third of these loans.

The foreign subsidiaries' budgets were regularly sent to appellant for its information but specific approval was not required. Current financial data were furnished to appellant each month. The foreign subsidiaries provided appellant with a more detailed financial statement at the end of each year. Although appellant's management thus kept informed of operations of the foreign subsidiaries, most financial decisions were made by the management of the individual companies.

All the foreign subsidiaries except those in the Netherlands and Germany were audited by the accounting firm which appellant used for its own audits. On the other hand, tax returns to foreign governments were locally prepared. These returns reported only the revenue produced and costs incurred by the subsidiary in the taxing jurisdiction. Each subsidiary used local law firms.

Appellant purchased no raw materials or finished products from its subsidiaries and did not engage in joint marketing efforts with them. Appellant sold paperboard and raw materials in small amounts to the foreign subsidiaries; those materials could have been obtained from other sources. Appellant also purchased paper products from outside parties, for the benefit of the foreign subsidiaries. Appellant entered

into technical service agreements with some subsidiaries and provided such services for other subsidiaries under informal arrangements. Appellant did not cooperate so extensively with any nonaffiliated companies.

Occasionally, appellant assisted subsidiaries in the acquisition of equipment and machinery. Some of the equipment was purchased directly from appellant. Appellant also sometimes acted as a sales broker for the foreign subsidiaries. Although this function could have been performed by independent brokers, the commissions charged by the latter would probably be higher than the charge appellant made for the same services.

■ Appellant contends that its California and out-of-state operations do not comprise a unitary enterprise to which respondent board may properly apply its formula for apportionment of income. Constitutional principles prohibit taxation in the absence of a link between the property to be taxed and the taxing entity. (See *Mobil Oil Corp.* v. *Commissioner of Taxes* (1980) 445 U.S. 425, 436-437 [63 L.Ed.2d 510, 520-521, 100 S.Ct. 1223]; *Miller Bros. Co.* v. *Maryland* (1954) 347 U.S. 340, 344-345 [98 L.Ed. 744, 748, 74 S.Ct. 538].) Appellant maintains that the "unitary method of ownership, use and operation of the business of the parent and its subsidiaries" was not established here. (See *Edison California Stores* v. *McColgan* (1947) 30 Cal.2d 472, 482 [183 P.2d 16].)

■ Because the parties submitted the case to the trial court on a stipulation, the case presents no conflicting evidence. Therefore, this court is not constrained by the substantial evidence rule. The trial court's findings are not binding on us and we must make our own determination of the questions of law presented by the stipulated facts. (*Rice Growers' Association of California* v. *County of Yolo* (1971) 17 Cal. App.3d 227, 230 [94 Cal.Rptr. 847], cert. den. 404 U.S. 941 [30 L.Ed.2d 255, 92 S.Ct. 286]; *Dealers Installation Service, Inc.* v. *State Bd. of Equal.* (1970) 13 Cal.App.3d 395, 399 [90 Cal.Rptr. 888]; *Chase Brass & Copper Co.* v. *Franchise Tax Bd.* (1970) 10 Cal.App.3d 496, 502 [95 Cal.Rptr. 805], cert. den. 400 U.S. 961 [27 L.Ed.2d 381, 91 S.Ct. 365]; *Standard Register Co.* v. *Franchise Tax Board* (1968) 259 Cal.App.2d 125, 129-130 [66 Cal.Rptr. 803].)

A corporate taxpayer's income must be subjected to apportionment[2] when it "is derived from or attributable to sources both within and without the State." (Rev. & Tax. Code, § 25101, set out in fn. 1, *ante*; *Honolulu Oil Corp.* v. *Franchise Tax Bd.* (1963) 60 Cal.2d 417, 425 [34 Cal.Rptr. 552, 386 P.2d 40]; *Superior Oil Co.* v. *Franchise Tax Bd.* (1963) 60 Cal.2d 406, 417 [34 Cal.Rptr. 545, 386 P.2d 33].) "[T]he linchpin of apportionability in the field of state income taxation is a unitary-business principle." (*Mobil Oil Corp.* v. *Commissioner of Taxes, supra*, 445 U.S. 425, 439 [63 L.Ed.2d 510, 522].) The fairness of allocating to California a just proportion of the profits earned from a unitary business[3] is settled. (See *Butler Bros.* v. *McColgan* (1942) 315 U.S. 501, 509 [86 L.Ed. 991, 997, 62 S.Ct. 701]; *El Dorado Oil Works* v. *McColgan* (1950) 34 Cal.2d 731, 738 [215 P.2d 4], app. dism., 340 U.S. 801 [95 L.Ed. 589, 71 S.Ct. 52]; *Edison California Stores* v. *McColgan* (1947) 30 Cal.2d 472, 478 [183 P.2d 16]; *Butler Bros.* v. *McColgan* (1941) 17 Cal.2d 664, 677-678 [111 P.2d 334], affd. in 315 U.S. 501 [86 L.Ed. 991, 62 S.Ct. 701]; *Handlery* v. *Franchise Tax Bd., supra*, 26 Cal.App.3d 970, 974.)

The propriety of applying the unitary concept in taxing foreign corporations was established in *Butler Bros.* v. *McColgan, supra*, 17

---

[2]The California method of apportionment is explained in Keesling & Warren, *The Unitary Concept in the Allocation of Income* (1960) 12 Hastings L.J. 42, 43: "Under the formula method the business activities within the state are considered to be an inseparable part of a business carried on both within and without the state. The total gross income from the entire business is determined. The allowable deductions are then subtracted and the remaining net income is apportioned within and without the state by means of an allocation formula consisting of various factors which are thought to be relevant in the production of income, such as property, payroll, and sales."

[3]Keesling and Warren also discuss the unitary treatment of multicorporate enterprises (*op. cit. supra*, 12 Hastings L.J. 42, 57): "In any case where a business would be considered unitary if conducted by one taxpayer, it should likewise be so considered even though conducted by two or more affiliated corporations. Just as a state may look beyond its borders and take into account the entire income of a business in arriving at a determination of the amount of income reasonably attributable to the activities conducted within the state, so in the case of a group of affiliated corporations engaged in the conduct of a business, it may look at the total income of the group to determine the amount of income attributable to the portion of the business conducted within the state by one or more of the members of the group."

The fairness of the formula apportionment method is explained as follows: "[T]he 'formula' apportionment of unitary business income has not only been found to be constitutionally permissible, but . . . it is often the only reasonable and practical manner in which a state may levy and collect taxes to which it is constitutionally entitled. It might be described as a sort of rule of necessity, having its origin in the accommodation of a state's constitutional right to tax income derived from within the state, to constitutional due process of law and interstate commerce provisions." (*Handlery* v. *Franchise Tax Bd.* (1972) 26 Cal.App.3d 970, 974 [103 Cal.Rptr. 465].)

Cal.2d 664. The court there noted that only in circumstances where the corporation's California business is "truly separate and distinct from its business without this state, so that the segregation of income may be made clearly and accurately, that the separate accounting method may properly be used." (*Id.*, at pp. 667-668.) The court set out a three-part test to determine the unitary nature of a taxpayer's business: "(1) unity of ownership; (2) unity of operation as evidenced by central purchasing, advertising, accounting and management divisions; and (3) unity of use in its centralized executive force and general system of operation." (*Id.*, at p. 678; see *Honolulu Oil Corp.* v. *Franchise Tax Bd., supra,* 60 Cal.2d 417, 423; *Superior Oil Co.* v. *Franchise Tax Bd., supra,* 60 Cal.2d 406, 412; *John Deere Plow Co.* v. *Franchise Tax Bd.* (1951) 38 Cal.2d 214, 229 [238 P.2d 569], app. dism., 343 U.S. 939 [96 L.Ed. 1345, 72 S.Ct. 1036]; *Edison California Stores* v. *McColgan, supra,* 30 Cal.2d 472, 478; *Chase Brass & Copper Co.* v. *Franchise Tax Bd., supra,* 10 Cal.App.3d 496, 502; *Standard Register Co.* v. *Franchise Tax Board, supra,* 259 Cal.App.2d 125, 129.)

■ The first element, unity of ownership, is present here: the parent corporation owned the foreign subsidiaries. However, unity of ownership does not render a business unitary if the other two requirements are not met. (See *Chase Brass & Copper Co.* v. *Franchise Tax Bd., supra,* 10 Cal.App.3d 496, 502.)

Unity of operation and unity of use are concepts that may to some degree overlap, but generally functions that in administrative theory are labeled "staff" fall within the "operation" category and "line" functions fall within the "use" category. (See *Chase Brass & Copper Co.* v. *Franchise Tax Bd., supra,* 10 Cal.App.3d 496, 502.) Determining the presence of unity between the parent corporation and the foreign subsidiaries in the area of operations is guided by various factors; no one element controls the decision.

Although appellant bought no raw materials or finished products from its subsidiaries, appellant did sometimes sell small quantities of paperboard and raw materials to its subsidiaries. The subsidiaries could have obtained those materials from other sources at the same price appellant charged, but the access to materials stocked by the parent is of some relevance. (See *Chase Brass & Copper Co.* v. *Franchise Tax Bd., supra,* 10 Cal.App.3d 496, 503.)

Appellant sold some of its used equipment to its subsidiaries during the period in question. Appellant also assisted its subsidiaries in the acquisition of equipment and machinery. Appellant sometimes contacted a subsidiary when considering disposition of a piece of equipment in good operating order that might assist in the subsidiary's operation.

Appellant assisted its subsidiaries in procuring paper, personnel and equipment. Appellant purchased some paper from third parties in order to convey such goods to its foreign subsidiaries. If a subsidiary was unable to fill an important vacancy, it would request assistance from appellant in locating an individual with the proper qualifications. Appellant generally looked within its own ranks for such a person. Appellant's purchasing department played a part in procuring equipment from independent suppliers for the benefit of its subsidiaries. These purchasing and brokerage ties between parent and subsidiary are of some relevance. (See *Chase Brass & Copper Co.* v. *Franchise Tax Bd., supra*, 10 Cal.App.3d 496, 503.)

Although appellant and all but two of its foreign subsidiaries kept separate books of account, all the foreign operations were audited by the same accounting firm that audited appellant's books. A format developed by appellant for the transmission of monthly and quarterly financial reports was used by the subsidiaries.

Appellant loaned to its subsidiaries over $18 million during the period in question. Appellant also guaranteed approximately one-third of the subsidiaries' other loans. Although the subsidiaries may have been able to obtain credit from other sources, the loans serve as "substantial evidence of unity of operation." (*Chase Brass & Copper Co.* v. *Franchise Tax Bd., supra*, 10 Cal.App.3d 496, 503.) The fact that the subsidiaries could readily turn to appellant for financial assistance points toward unity. (*Id.*) So does the foreign subsidiaries' ability to utilize appellant as a guarantor of its loans. "It must have been deemed advantageous to the over-all management to have handled the transaction in this way, otherwise a separate arrangement would have been made." (*Chase Brass & Copper Co.* v. *Franchise Tax Bd., supra*, 10 Cal.App.3d 496, 503.)

Although there were no common employee benefit plans, some employees of the subsidiaries remained on appellant's payroll. Employees of appellant who transferred to the foreign subsidiaries were allowed to

continue their employee benefits, and seven such employees were given options to purchase appellant's stock.

There was considerable interplay between appellant and its foreign subsidiaries in the area of corporate expansion. Although there was no continued effort by appellant to solicit business for its foreign subsidiaries, on at least one occasion appellant assisted in the negotiation of a contract for a foreign subsidiary.

The third element, unity of use, relates to executive forces and operational systems. (*Superior Oil Co. v. Franchise Tax Bd., supra,* 60 Cal.2d 406, 415; *Chase Brass & Copper Co. v. Franchise Tax Bd., supra,* 10 Cal.App.3d 496, 504.) Appellant contends that the absence of a steady flow of raw materials and manufactured goods between the parent corporation and its subsidiaries compels a conclusion that unity of use is lacking. But the California Supreme Court has twice held an operation to be unitary though there was no substantial flow of goods between corporate entities. (See *Honolulu Oil Corp. v. Franchise Tax Bd., supra,* 60 Cal.2d 417; *Superior Oil Co. v. Franchise Tax Bd., supra,* 60 Cal.2d 406.) In *Superior Oil, supra,* the Supreme Court declared that "[n]one of the three unities ... necessarily require the interstate movement of products." (*Id.,* at p. 415.) In *Honolulu Oil, supra,* 60 Cal.2d 417, the court rejected a contention that control by central management and centralized performance of service functions are insufficient alone to support a conclusion of a unitary operation (*id.,* at p. 423), and determined that "the mere fact that production and sale ... are a local operation does not transform that operation to something distinct and apart." (*Id.,* at p. 424.)

Citing *Chase Brass & Copper Co. v. Franchise Tax Bd., supra,* 10 Cal.App.3d 496, appellant argues that *Honolulu Oil* and *Superior Oil* are not applicable outside the special facts presented in those cases. In *Chase Brass* this court held that a California subsidiary was not unitary with that part of its parent's operation which dealt with materials not being purchased by the subsidiary. (*Id.,* 10 Cal.App.3d at p. 506.) But the decision does not depart from the earlier and binding holdings in *Honolulu Oil* and *Superior Oil, supra.* The ties which existed between the parent and subsidiary in areas beyond the subsidiary's normal business activities appear to have been too tenuous to be given weight. Furthermore, the court noted that "[t]he fact of the sales alone ... does not determine the business to be unitary." (*Id.,* at p. 506.) Appellant's contention that a substantial flow of goods is essential to the

existence of a unitary manufacturing or mercantile business must be rejected. Product flow is important but it is only one of several factors to be evaluated in determining whether a business is unitary.

Appellant complains that the imposition of the unitary apportionment system severely misallocates to California, income from foreign sources. Appellant suggests that to avoid such a result substantial flow of goods between the parent and the subsidiary should be prerequisite to a determination of unitary status. But the adoption of a different formula than the one presently in effect is a legislative matter.

Because a substantial flow of goods between the parent and its subsidiaries is not requisite to unitary status, the operational interrelationship of the corporate entities must be evaluated. The integration of major executive functions is a factor of great importance pointing toward unity. (See *Chase Brass & Copper Co.* v. *Franchise Tax Bd., supra,* 10 Cal.App.3d 496, 504.) Although the everyday operations of the subsidiaries were handled by local employees, major policy decisions of the subsidiaries were subject to review by appellant. "The 'major policy matters' are what count in our estimation of integration." (*Chase Brass & Copper Co.* v. *Franchise Tax Bd., supra,* 10 Cal.App. 3d 496, 504.) High officials of appellant gave directions to subsidiaries for compliance with the parent's standard of professionalism, profitability and ethical practices. Appellant constantly reviewed the financial reports of its subsidiaries; if these reports had not given sufficient information of a subsidiary's condition, appellant would have intervened. The submission of financial reports on a monthly basis from the subsidiary to the parent corporation is of some significance. (See *Standard Register Co.* v. *Franchise Tax Board, supra,* 259 Cal.App.2d 125, 136.) Appellant's officials served on the boards of directors of most of the subsidiaries. Thus, control on the highest level was exerted by appellant. Appellant also employed a "foreign operations staff" to oversee the subsidiaries, to prepare studies regarding the subsidiaries' activities and to give directions to the management of the subsidiaries.

Appellant's policy of regional decentralization was followed by the subsidiaries. The parent corporation was involved with the training of local nationals for management positions. Appellant provided important personnel, equipment and financing to assist its first foreign subsidiary to enter the paperboard packaging industry. Such assistance in the initial stages of operation was crucial to the success of the subsidiary. Appellant continued to provide technical assistance to its subsidiaries.

The subsidiaries had ready access to appellant's expertise. The subsidiaries were only charged costs and an apportionment of overhead; in some cases the charges were not recovered. The extent of the technical assistance provided by appellant was substantial; it included design work, sample packaging, marketing research, formula methods used in packaging and cost accounting. Appellant did not provide extensive technical service to any nonaffiliated corporations. The subsidiaries were prohibited from transferring information received from appellant to third parties.

The consolidation of the domestic and overseas operations extended to a public image of unity; in its 1963 annual report, appellant referred to the employees of subsidiaries as its own employees.

Appellant argues that the foreign subsidiaries are independent in their management, production, and distribution. But appellant's organizational framework calls for decentralization even in its United States operations. The relationship between parent and subsidiary comports with appellant's general philosophy of local management and a reliance on key executives to meet corporate goals. Appellant emphasizes the lack of product flow between the parent and the subsidiaries. But the low level of product exchange must be considered in conjunction with the nature of the business, high transportation costs and import restrictions. All but the latter consideration apply to appellant's United States operations. The desirability of creating an image of a locally operated enterprise is evident. The court in *Standard Register Co. v. Franchise Tax Board, supra*, 259 Cal.App.2d 125, recognized this tendency. "At all times Pacific division attempted to create the image of its being a California manufacturer in order to compete in the western market which was very conscious of buying western." (*Id.*, at p. 132.) The characterization by the parent corporation of its subsidiary as an independent entity does not compel a finding that several divisions of a corporation are nonunitary. Here, as in *Standard Register*, a study of the operations of appellant and its subsidiaries shows areas where the subsidiaries acted independently of appellant. But there are other areas in which the parent and subsidiaries contributed to each other in unity of use and unity of operation. (See *Standard Register Co. v. Franchise Tax Board, supra*, 259 Cal.App.2d 125, 134-135.) Appellant's own view of its operations as a unitary business is evidenced by statements in the company's annual reports. Appellant identifies itself as "the world's largest producer of paperboard packaging," referring to overseas and

domestic operations. Appellant also discussed in its reports the strategic location of packaging, printing and fabricating facilities both in the United States and abroad. Appellant stated that "[t]he overseas operations of CCA continue to grow and to become a more substantial part of the company's strength and profitability." Appellant further projected the image of unity by referring to its subsidiaries as overseas operations or overseas divisions. Appellant's self-image is relevant. (See *Standard Register Co.* v. *Franchise Tax Board, supra,* 259 Cal.App.2d 125, 135.)

The three unities are satisfied here. Although some elements which normally exist in a unitary operation, e.g., a substantial flow of goods, are lacking, the combination of all the factors and ties between the parent and the subsidiary support respondent board's determination that the operation is unitary. Appellant engaged in the same business activities as its subsidiaries. The administrative regulations indicate that a strong inference of a unitary business exists where the taxpayer is engaged in the same type of business.[4] This administrative construction of the California tax laws "is entitled to great weight, and the courts generally will not depart from such construction unless it is clearly erroneous or unauthorized." (*Coca Cola Co.* v. *State Bd. of Equalization* (1945) 25 Cal.2d 918, 921 [156 P.2d 1]; also see *Select Base Materials* v. *Board of Equal.* (1959) 51 Cal.2d 640, 647 [335 P.2d 672]; *Albright* v. *State of California* (1979) 101 Cal.App.3d 14, 18 [161 Cal.Rptr. 317]; *California Correctional Officers' Assn.* v. *Board of Administration* (1978) 76 Cal.App.3d 786, 793-794 [143 Cal.Rptr. 125]; *Clayton* v. *County of Los Angeles* (1972) 26 Cal.App.3d 390, 396 [102 Cal.Rptr. 687].) The interchange between parent and subsidiaries in the areas of technical assistance, development and management policymaking, is significant.

---

[4]California Administrative Code, title 18, section 25120, subdivision (b), provides in part: "The determination of whether the activities of the taxpayer constitute a single trade or business or more than one trade or business will turn on the facts of each case. In general, the activities of the taxpayer will be considered a single business if there is evidence to indicate that the divisions under consideration are integrated with, dependent upon or contribute to each other and the operations of the taxpayer as a whole. The following factors are considered to be good indicia of a single trade or business; and the presence of any of these factors creates a strong presumption that the activities of the taxpayer constitute a single trade or business:

"(1) *Same type of business*: A taxpayer is generally engaged in a single trade or business when all of its activities are in the same general line. For example, a taxpayer which operates a chain of retail grocery stores will almost always be engaged in a single trade or business."

The portion of appellant's business done within the State of California is dependent upon or contributes to the operation of the business outside the state. (*Superior Oil Co.* v. *Franchise Tax Bd., supra,* 60 Cal.2d 406, 412; *Edison California Stores* v. *McColgan, supra,* 30 Cal.2d 472, 481; *Chase Brass & Copper Co.* v. *Franchise Tax Bd., supra,* 10 Cal.App.3d 496, 501.) Although in many respects the foreign subsidiaries acted independently, the financing, general direction and control of the subsidiaries were in the hands of appellant. The subsidiaries were treated as overseas divisions of the parent corporation, bringing appellant's entire operation within the provisions of section 25101 of the Revenue and Taxation Code and requiring application of the formula apportionment method in determining the California taxes due from appellant.

Appellant contends that the inclusion of its foreign subsidiaries in the apportionment base violates the California taxation statute as well as the due process clause. But *Superior Oil Co.* v. *Franchise Tax Bd., supra,* 60 Cal.2d 406, *Honolulu Oil Corp.* v. *Franchise Tax Bd., supra,* 60 Cal.2d 417, *John Deere Plow Co.* v. *Franchise Tax Board, supra,* 38 Cal.2d 214, and *Max Factor & Co.* v. *Franchise Tax Bd.* (1973) 35 Cal.App.3d 7 [110 Cal.Rptr. 536], contradict appellant's argument. The court in *Max Factor, supra,* noted that "Appellant (Taxpayer) is a Delaware corporation doing business in California. In the years in question, it had three subsidiary corporations operating in foreign countries . . . . In determining the measure of California franchise tax, Taxpayer and its subsidiaries were properly treated as 'engaged in a single unitary business.' (See Rev. & Tax. Code, §§ 25101, 25102; *Edison California Stores* v. *McColgan,* 30 Cal.2d 472, 479-480.)" (*Id.,* at p. 9.) Appellant relies on *Chase Brass & Copper Co.* v. *Franchise Tax Bd., supra,* 10 Cal.App.3d 496, as indicating that foreign subsidiaries should not be included in the apportionment base. Appellant states that "it seems fair to assume that the fact Braden was operating in a foreign country, as are the foreign subsidiaries in this case, was an important factor in the court's determination." The assumption is unwarranted. Although the operations of Braden Company were excluded, so were those of Bear Creek Company, a United States operation. (*Id.,* at p. 506.) The court in *Chase Brass* distinguished between vertical and horizontal relationships. (See *Chase Brass & Copper Co.* v. *Franchise Tax Bd., supra,* 10 Cal.App.3d 496, 502.) The taxpayer in *Chase* was a California subsidiary of a United States parent corporation which also had other subsidiaries. Here, the taxpayer is the parent corporation; the vertical

ties between parent and subsidiary are stronger than horizontal ties between sibling subsidiaries.

The due process challenge to the inclusion of foreign subsidiaries in the apportionment base of a state's taxation formula was rejected by the United States Supreme Court in *Bass, Ratcliff & Gretton, Ltd.,* v. *State Tax Comm.* (1924) 266 U.S. 271 [69 L.Ed. 282, 45 S.Ct. 82]. The court held that "[i]f the entire business of the corporation is not transacted within the State, the tax is to be based upon the portion of such ascertained net income determined by the proportion which the aggregate value of specified classes of the assets of the corporation within the State bears to the aggregate value of all such classes of assets wherever located." (*Id.,* at pp. 277-278 [69 L.Ed. at p. 285].) The apportionment method was approved because the state meant to reach and in fact did reach only the profits earned within the state. Here, too, the California apportionment method is designed to reach profits earned within the state by combining all of appellant's unitary operations. The Supreme Court reiterated its basic premise in *Mobil Oil Corp.* v. *Commissioner of Taxes, supra,* 445 U.S. 425. The taxpayer in *Mobil Oil* did not argue that the state's worldwide apportionment was inaccurate and unfair but asserted that foreign source income was subject to different tests. The Supreme Court in *Mobil Oil* stressed the importance of the unitary business principle as a justification for inclusion of foreign source income in a state's apportionment base. (*Id.,* at p. 438 [63 L.Ed.2d at p. 521].) The Supreme Court noted the connection between due process requirements and the determination that a business is unitary: "Where the business activities of the ... [subsidiaries] have nothing to do with the activities of the recipient in the taxing State, due process considerations might well preclude apportionability, because there would be no underlying unitary business. . . . Mobil has failed to sustain its burden of proving any unrelated business activity on the part of its subsidiaries and affiliates that would raise the question of nonapportionability." (*Id.,* at p. 442 [63 L.Ed.2d at pp. 523-524].)

Due process demands that a minimal connection exist between the out-of-state activities and the taxing state and a rational relationship between income attributed to the out-of-state and the intrastate values of the enterprise. The tax may not be disproportionate to the business transacted by appellant in the taxing state. (*Exxon Corp.* v. *Wisconsin Dept. of Revenue* (1980) 447 U.S. 207, 219-220 [65 L.Ed.2d 66, 78-79, 100 S.Ct. 2109]; *Hans Rees' Sons* v. *North Carolina* (1931) 283 U.S.

123, 135 [75 L.Ed. 879, 907-908, 51 S.Ct. 385].) A sufficient nexus is established if the corporation "avails itself of the 'substantial privilege of carrying on business' within the state;..." (*Mobil Oil Corp.* v. *Commissioner of Taxes, supra*, 445 U.S. 425, 437 [63 L.Ed.2d 510, 520]; also see *Exxon Corp.* v. *Wisconsin Dept. of Revenue, supra*, 447 U.S. 207, 220 [65 L.Ed.2d 66, 79].)

Appellant asserts that the application of the apportionment formula to foreign subsidiaries fails to account for different wages, property costs and returns on sales. Appellant recognizes that there are variations in wages, property costs and returns on sales within the United States, but argues that the wholly different nature of the elements in foreign countries creates an unreasonable result. Variations in profitability within the United States have not precluded apportionment of income according to an appropriate formula. (See *John Deere Plow Co.* v. *Franchise Tax Bd., supra*, 38 Cal.2d 214, 224-225.) Where a company is engaged in a unitary business, a state may apply an apportionment formula to the taxpayer's total income to arrive at a rough approximation of the corporate income attributable to activities within the state. (*Exxon Corp.* v. *Wisconsin Dept. of Revenue, supra*, 447 U.S. 207, 223 [65 L.Ed.2d 66, 81]; *Moorman Mfg. Co.* v. *Bair* (1978) 437 U.S. 267, 273 [57 L.Ed.2d 197, 204-205, 98 S.Ct. 2340].) There is no necessity for a substantial flow of goods between the parent and the subsidiary corporation. Although appellant may treat its foreign operations as independent, the business activities of the subsidiaries benefit substantially from "an umbrella of centralized management and controlled interaction." (*Exxon Corp.* v. *Wisconsin Dept. of Revenue, supra*, 447 U.S. 207, 224 [65 L.Ed.2d 66, 81].)

Appellant points out that for its own purposes income derived from appellant's United States operations is separately accounted for. But a taxpayer's internal accounting methods are not binding on the taxing authorities. (*Exxon Corp.* v. *Wisconsin Dept. of Revenue, supra*, 447 U.S. 207, 224 [65 L.Ed.2d 66, 81-82]; see *Butler Bros.* v. *McColgan, supra*, 315 U.S. 501, 507-508 [86 L.Ed. 991, 996].)

Appellant points to each of the factors used in the formula apportionment in California—wages, property and sales—and emphasizes the major differences between wage rates in the United States and those in other countries. Appellant asserts that this wage differential is not offset by a higher level of productivity. But such variations in wages also exist in the United States, and do not preclude unitary treatment.

Respondent may constitutionally apply its apportionment formula to appellant's total income in order to establish tax liability. Appellant had the "distinct burden of showing by 'clear and cogent evidence' that it results in extraterritorial values being taxed." (*Butler Bros.* v. *McColgan, supra*, 315 U.S. 501, 507 [86 L.Ed. 991, 996]; *Norfolk & W. Ry. Co.* v. *North Carolina* (1936) 297 U.S. 682, 688 [80 L.Ed. 977, 982, 56 S.Ct. 625].) Appellant's accounting evidence does not meet that burden. The fairness of applying the formula apportionment method must be evaluated in practical terms. A state's attempt to impose an accounting method in order to determine its proper share of the burden of taxation is "faced with the impossibility of allocating specifically the profits earned by the processes conducted within its borders." (*Underwood Typewriter Co.* v. *Chamberlain* (1920) 254 U.S. 113, 121 [65 L.Ed. 165, 169, 41 S.Ct. 45]; also see *Exxon Corp.* v. *Wisconsin Dept. of Revenue, supra*, 447 U.S. 207, 224 [65 L.Ed.2d 66, 81-82].) California's apportionment is not so burdensome as to violate due process.

Appellant urges that its statistical evidence shows that the application of the apportionment formula yields a distorted result. The United States Supreme Court in *Norfolk & W. R. Co.* v. *Tax Comm'n.* (1968) 390 U.S. 317, 329 [19 L.Ed.2d 1201, 1209, 88 S.Ct. 995], held that "when a taxpayer comes forward with strong evidence tending to prove that the . . . formula will yield a grossly distorted result in its particular case, the State is obliged to counter that evidence or to make the accommodations necessary to assure that its taxing power is confined to its constitutional limits. If it fails to do so and if . . . the taxpayer has . . . show[n] that the tax is so excessive as to burden interstate commerce, the taxpayer must prevail." The evidence appellant presented with respect to the disproportionality of income allocation is not compelling. It fails to account for contributions to income which result from the functional integration and centralization of management which exist in a unitary operation. It is "misleading to characterize the income of the business as having a single identifiable 'source.' Although separate geographical accounting may be useful for internal auditing, for purposes of state taxation it is not constitutionally required." (*Mobil Oil Corp.* v. *Commissioner of Taxes, supra*, 445 U.S. 425, 438 [63 L.Ed.2d 510, 521]; also see *Exxon Corp.* v. *Wisconsin Dept. of Revenue, supra*, 447 U.S. 207, 222-223 [65 L.Ed.2d 66, 80-81].)

█ Appellant contends, citing *Japan Line, Ltd.* v. *County of Los Angeles* (1979) 441 U.S. 434 [60 L.Ed.2d 336, 99 S.Ct. 1813], that inclusion of its foreign subsidiaries in the apportionment formula is an

unconstitutional burden on foreign commerce. But the question presented in *Japan Line* was "whether instrumentalities of commerce that are owned, based, and registered abroad and that are used exclusively in international commerce, may be subjected to apportioned ad valorem property taxation by a State." (*Id.*, at p. 444 [60 L.Ed.2d at p. 345].) The court did not reach questions as to "taxability of foreign-owned instrumentalities engaged in interstate commerce, or of domestically owned instrumentalities engaged in foreign commerce." (*Id.*, at p. 444, fn. 7 [60 L.Ed.2d at p. 345].) The Supreme Court distinguished situations involving a lack of apportionment from those challenging the mathematical imprecision of an apportionment formula. *Japan Line* involved a situation "where true apportionment does not exist and cannot be policed by this Court at all." (*Id.*, at p. 455 [60 L.Ed.2d at p. 352].) Thus, *Japan Line* does not affect the present case.

The Constitution of the United States (art. I, § 8, cl. 3) provides that "Congress shall have power ... 3. To regulate commerce with foreign nations, and among the several states, and with the Indian tribes." Generally, if the state tax "is applied to an activity with a substantial nexus with the taxing State, is fairly apportioned, does not discriminate against interstate commerce, and is fairly related to the services provided by the State," there is no impermissible burden on interstate commerce. (*Complete Auto Transit, Inc.* v. *Brady* (1977) 430 U.S. 274, 279 [51 L.Ed.2d 326, 331, 97 S.Ct. 1076].) But when a state seeks to tax instrumentalities of foreign commerce, two additional considerations are involved. The first is the enhanced risk of multiple taxation. The second is that state tax on instrumentalities of foreign commerce may impede federal uniformity in an area where such uniformity is essential. (*Japan Line Ltd.* v. *County of Los Angeles, supra*, 441 U.S. 434, 446-448 [60 L.Ed.2d 336, 346-347].) "Due to the absence of an authoritative tribunal capable of ensuring that the aggregation of taxes is computed on no more than one full value, a state tax, even though 'fairly apportioned' to reflect an instrumentality's presence within the State, may subject foreign commerce '"to the risk of a double tax burden to which [domestic] commerce is not exposed and which the commerce clause forbids."' *Evco* v. *Jones*, 409 U.S., at 94, quoting *J. D. Adams Mfg. Co.*, 304 U.S., at 311." (*Japan Line, Ltd.* v. *County of Los Angeles, supra*, 441 U.S. 434, 447-448 [60 L.Ed.2d 336, 347].) Appellant's multiple taxation claim rests predominantly on the conflict between the California apportionment system and a separate accounting method. The variations which result from the imposition of two different methods of calculation do not necessarily violate the commerce clause. The

Supreme Court has consistently held that the commerce clause "does not call for mathematical exactness nor for the rigid application of a particular formula; only if the resulting valuation is palpably excessive will it be set aside." (*Northwest Airlines* v. *Minnesota* (1944) 322 U.S. 292, 325 [88 L.Ed. 1283, 1303, 64 S.Ct. 950, 153 A.L.R. 245] [Stone, C. J., dis.], quoted in *Japan Line, Ltd.* v. *County of Los Angeles, supra*, 441 U.S. 434, 455 [60 L.Ed.2d 336, 352].)

The totally international character of the corporate taxpayer in *Japan Line* is distinguished from the present situation where a United States parent corporation attempts to sever ties with its foreign subsidiaries for purposes of state taxation. The taxes levied by California are against appellant, a United States corporation doing business in the State of California, as opposed to a tax upon the foreign subsidiaries. The normal variations entailed in the use of different accounting formulas do not create such multiple taxation problems as to require its prohibition here. Further, the tax imposed in *Japan Line* was on instrumentalities of foreign commerce. By contrast, the tax imposed here is on total corporate operations; there is no curb on the free flow of commerce.

The unilateral act of one state may not be permitted to impede the conduct of United States foreign relations and foreign trade.[5] Appellant argues that the California approach could lead to retaliation and the imposition of a heavier tax burden by other states. Appellant underscores the differences between the federal tax scheme and the California formula apportionment method. Appellant insists that use of the federal separate accounting methods would simplify and standardize the worldwide approach to taxation. Adoption of the federal approach would purportedly reduce or eliminate impediments to the flow of cap-

---

[5]Examples of ways in which state government formulas may impede federal uniformity are provided in *Japan Line, Ltd.* v. *County of Los Angeles, supra*, 441 U.S. 434, 450-451 [60 L.Ed.2d 336, 349]: "A state tax on instrumentalities of foreign commerce may frustrate the achievement of federal uniformity in several ways. If the State imposes an apportioned tax, international disputes over reconciling apportionment formulae may arise. If a novel state tax creates an asymmetry in the international tax structure, foreign nations disadvantaged by the levy may retaliate against American-owned instrumentalities present in their jurisdictions. Such retaliation of necessity would be directed at American transportation equipment in general, not just that of the taxing State, so that the Nation as a whole would suffer. If other States followed the taxing State's example, various instrumentalities of commerce could be subjected to varying degrees of multiple taxation, a result that would plainly prevent this Nation from 'speaking with one voice' in regulating foreign commerce."

ital and technology between the nations. But federal legislation requiring a uniform method for state taxation has never been adopted. (See *Mobil Oil Corp.* v. *Commissioner of Taxes, supra*, 445 U.S. 425, 449 [63 L.Ed.2d 510, 528].) The California statutory scheme here adopted does not impermissibly burden international commerce. Appellant, the parent corporation, is engaged in a unitary operation with its foreign subsidiaries. Thus, the total corporate operations are subject to California's apportionment formula.

The judgment is affirmed.

Caldecott, P. J., and Poché, J., concurred.

A petition for a rehearing was denied May 4, 1981, and appellant's petition for a hearing by the Supreme Court was denied June 17, 1981.