In re NEWEDGE, a Nevada corporation, Debtor.

R. Todd NEILSON, Successor Trustee of Newedge, Plaintiff,

v.

STATE OF CALIFORNIA, FRANCHISE TAX BOARD, Defendant.

No. LA 87–01467–NCA.
Adv. No. LA 88–01821–NCA.

United States Bankruptcy Court, C.D. California.

June 12, 1989.

Jeremey V. Richards, Pachulski, Stang & Ziehl, Los Angeles, Cal., and Nancy L. Iredale, Jeffrey G. Varga, Paul, Hastings, Janofsky & Walker, Los Angeles, Cal., for R. Todd Neilson, Successor Trustee.

Lawrence P. Scherb, II, Deputy Atty. Gen., State of Cal., Los Angeles, Cal., for defendant.

## STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW

CALVIN K. ASHLAND, Bankruptcy Judge.

The motion for partial summary judgment of plaintiff R. Todd Neilson, Successor Trustee of debtor Newedge, a Nevada corporation, came on for hearing before the Court on March 20, 1988, the Honorable Calvin K. Ashland, United States Bankruptcy Judge, presiding. The plaintiff was represented by Pachulski, Stang & Ziehl, P.C., with an appearance by Jeremy V. Richards, and by Paul, Hastings, Janofsky & Walker, with appearances by Nancy L. Iredale and Jeffrey G. Varga. The defendant, State of California, Franchise Tax Board, was represented by John K. Van de Kamp, Attorney General of the State of California, Edmond B. Mamer, Supervising Deputy Attorney General, Lawrence P. Scherb, II, Deputy Attorney General, with an appearance by Deputy Attorney General Lawrence P. Scherb II. The Court, having considered the plaintiff's moving papers, supporting declarations and exhibits, the defendant's opposition, the plaintiff's reply papers, oral argument of counsel, and all other matters properly a part of the record, hereby makes the following Statement of Uncontroverted Facts and Conclusions of Law:

## STATEMENT OF UNCONTROVERTED FACTS

1. This adversary proceeding was instituted, for among other reasons, to determine the California franchise tax liabilities of debtor Newedge, a Nevada corporation, of Edgington Oil Company, Inc., later known as Oldedge, Inc., a Delaware corporation (hereafter "Edgington"), and of a number of subsidiaries of the parent company, Triad America Corporation, a Utah corporation ("TAC") (collectively "Triad Group"). Plaintiff has moved for partial summary judgment. He seeks a determination that the California franchise tax liabilities of debtor, Edgington and the other Triad Group members listed in paragraphs 2 through 6, below, are correctly reported on the combined reports filed with defendant State of California, Franchise Tax Board ("FTB") for 1983, 1984 (as amended), 1985, 1986 and 1987,[1] and that debtor, Edgington and the Triad Group members listed in paragraph 7, below, may report their 1988 California franchise tax on a combined basis. This determination turns on the resolution of one issue: Whether Edgington properly reported, and may properly report for 1988, its California franchise tax liability on a combined basis with the other members of the Triad Group. The uncontroverted evidence overwhelmingly establishes that until it ceased to exist on December 27, 1988, Edgington and the other members of the Triad Group listed in paragraphs 2 through 7, below, constituted a single, unitary business during each tax year for which they were included on the combined report. Therefore, under section 25101 of the California Revenue and Taxation Code, Edgington and the respective members of the Triad Group properly filed combined reports for tax years 1983 through 1987, and may properly do so for tax year 1988.

2. Included in the combined report filed with the FTB for tax year 1983 are the following entities (*Plaintiff's Exhibit* 1):

a. Newedge Acquisitions;

b. Edgington Oil Company, Inc.;

---

[1] Plaintiff notes the Triad Group will file an amended 1987 combined report with the FTB and requests that the Court's determination be without prejudice to the filing of such an amended 1987 combined report.

c. Hercules Oil Company of San Diego, Inc.; and

d. Sahuaro Petroleum and Asphalt Company.

No tax was reported due for 1983; the combined report shows that taxpayers were entitled to a $129,755 credit for overpayment of tax.

3. Included in the combined report filed with the FTB for tax year 1984 (as amended) are the following entities (*Plaintiff's Exhibit* 2):

AK Memphis Properties, Inc.;
A.K. Houston Properties, Inc.;
Triad Utah;
Triad Center;
Salt Lake International Center;
Triad Service Company;
Border Properties, Inc.;
Heritage Endeavors, Inc.;
L.T. Properties, Inc.;
Moresco, Inc.;
P.B. Development, Inc.;
TVCC California Corporation;
Triad Properties Corporation;
Salt Lake Temple Imperial 400 Motel;
Foster Center Properties, Inc.;
Triad Management Corporation;
Triad Center Systems Corporation;
Triad Property Management Corporation;
Triad Development Company;
Triad Trolley Corporation;
Triad/LaCaille Ventures;
Triad/LaCaille Carriage Associates;
Triad/LaCaille Devereaux Associates;
Triad Real Estate Corporation;
Triad Energy Corporation;
American Capital Aviation Corporation;
Mark III Leasing Company;
Triad Security Company;
Triad Entertainment Company;
Triad Sports, Inc.;
Triad America Services Corporation;
N111EK Corporation;
Newedge;
Triad Theater Company;
Triad Handcart Marketplace;
Triad Executive Centers;
Triad Condas Corporation;

Trison Distributing, Inc.;
Edgington Oil Company, Inc.;
Hercules Oil Company of San Diego, Inc.;
Edgington Management Services, Inc.;
Sahuaro Petroleum and Asphalt Company;
Oasis Aviation, Inc.;
International Airmotive, Inc.; and
Triad International

No tax was reported due for 1984; the combined report shows that taxpayers were entitled to a refund of $64,553.

4. Included in the combined report filed with the FTB for tax year 1985 are the following entities. (Plaintiff's *Exhibit* 3):

N111EK Corporation;
American Capital Aviation Corporation;
Mark III Leasing Company;
Triad International;
Triad Management Corporation;
Triad Property Management Corporation;
Triad Telecommunications, Inc.;
Triad Properties Corporation;
Triad Condas Corporation;
A.K. Houston Properties, Inc.;
L.T. Properties, Inc.;
P.B. Development, Inc.;
Border Properties, Inc.;
Heritage Endeavors, Inc.;
Moresco, Inc.;
A.K. Memphis Properties, Inc.;
Foster Center Properties, Inc.;
TVCC California, A California Corporation;
Salt Lake International Center;
Triad Center;
Triad Entertainment Company;
Triad Handcart Marketplace;
Triad Theater Company;
Triad Trolley Corporation;
Triad Executive Centers;
Triad Real Estate Corporation;
Triad Utah;
Triad Energy Corporation;
Newedge;
Edgington Oil Company, Inc.;
Triad Aviation;

Triad America Services Corporation;
Triad Center Systems Corporation;
Triad Security Company;
Triad Service Company;
Triad Development Corporation;
Triad/LaCaille Ventures;
Triad/LaCaille Carriage Associates;
Triad/LaCaille Devereaux Associates;
Trison Distributing, Inc.;
Hercules Oil Company of San Diego, Inc.;
Sahuaro Petroleum and Asphalt Company;
Edgington Management Services, Inc.;
International Airmotive, Inc.;
Palace Hotel;
Slurry Seal of Arizona;
Dunn Enterprises, Inc.;
Slurry Seal of New Mexico;
L.A. Mar Industries, Inc.;
Highway and Road Products Company, Inc.;
Edgington Oil Limited;
Triad Financial Services;
Triad Colorado Properties Corporation.
Triad Hotel Company;
Resort Management, Inc.; and
Concrete Technology Corporation

No tax was reported due for 1985; the combined report shows that the above-named taxpayers were entitled to a credit of $416,660 as a result of overpaid estimated tax and 1984 credits applied to 1985.

5. Included in the combined report filed with the FTB for tax year 1986 are the following entities (*Plaintiff's Exhibit* 4):
N111EK Corporation;
American Capital Aviation Corporation;
Mark III Leasing Company;
Triad International;
Triad Management Corporation;
Triad Property Management Corporation;
Triad Telecommunications, Inc.;
Triad Properties Corporation;
Triad Condas Corporation;
A.K. Houston Properties, Inc.;
L.T. Properties, Inc.;
P.B. Development, Inc.;
Border Properties, Inc.;
Heritage Endeavors, Inc.;
Moresco, Inc.;
A.K. Memphis Properties, Inc.;
Foster Center Properties, Inc.;
TVCC California, A California Corporation;
Salt Lake International Center;
Triad Center;
Triad Entertainment Company;
Triad Handcart Marketplace;
Triad Theater Company;
Triad Trolley Corporation;
Triad Executive Centers;
Triad Real Estate Corporation;
Triad Utah;
Triad Energy Corporation;
Newedge;
Edgington Oil Company, Inc.;
Triad Aviation;
Triad America Services Corporation;
Triad Center Systems Corporation;
Triad Security Company;
Triad Service Company;
Triad Development Corporation;
Triad/LaCaille Ventures;
Triad/LaCaille Carriage Associates;
Triad/LaCaille Devereaux Associates;
Trison Distributing, Inc.;
Hercules Oil Company of San Diego, Inc.;
Sahuaro Petroleum and Asphalt Company;
Edgington Management Services, Inc.;
International Airmotive, Inc.;
Palace Hotel;
Slurry Seal of Arizona;
Dunn Enterprises, Inc.;
Slurry Seal of New Mexico;
L.A. Mar Industries, Inc.;
Highway and Road Products Company, Inc.;
Edgington Oil Limited;
Triad Financial Services; and
Triad Colorado Properties Corporation.

The 1986 combined report shows a $557 tax due the FTB for 1986 which has been paid in full.

6. Included in the combined report filed with the FTB for tax year 1987 are the following entities (*Plaintiff's Exhibit* 5):

N111EK Corporation;
American Capital Aviation Corporation;
Mark III Leasing Company;
Triad International;
Triad Management Corporation;
Triad Property Management Corporation;
Triad Telecommunications, Inc.;
Triad Properties Corporation;
Triad Condas Corporation;
A.K. Houston Properties, Inc.;
L.T. Properties, Inc.;
P.B. Development, Inc.;
Border Properties, Inc.;
Heritage Endeavors, Inc.;
Moresco, Inc.;
A.K. Memphis Properties, Inc.;
Foster Center Properties, Inc.;
TVCC California, A California Corporation;
Salt Lake International Center;
Triad Center;
Triad Entertainment Company;
Triad Handcart Marketplace;
Triad Theater Company;
Triad Trolley Corporation;
Triad Executive Centers;
Triad Real Estate Corporation;
Triad Utah;
Triad Energy Corporation;
Newedge;
Edgington Oil Company, Inc.;
Triad Aviation;
Triad America Services Corporation;
Triad Center Systems Corporation;
Triad Security Company;
Triad Service Company;
Triad Development Corporation;
Triad Food & Beverage Operation;
Triad/LaCaille Carriage Associates;
Triad/LaCaille Devereaux Associates;
Trison Distributing, Inc.;
Hercules Oil Company of San Diego, Inc.;
Sahuaro Petroleum and Asphalt Company;
Edgington Management Services, Inc.;
International Airmotive, Inc.;
Palace Hotel;
Slurry Seal of Arizona;
Dunn Enterprises, Inc.;
Slurry Seal of New Mexico;
L.A. Mar Industries, Inc.;
Highway and Road Products Company, Inc.;
Edgington Oil Limited;
Triad Financial Services; and
Triad Colorado Properties Corporation.
The 1987 combined report shows a $862 tax due the FTB which has been paid in full.

7. For tax year 1988, plaintiff intends to file a combined report with the FTB in which the following entities will be included:

N111EK Corporation;
American Capital Aviation Corporation;
Mark III Leasing Company;
Triad International;
Triad Management Corporation;
Triad Property Management Corporation;
Triad Telecommunications, Inc.;
Triad Properties Corporation;
Triad Condas Corporation;
A.K. Houston Properties, Inc.;
L.T. Properties, Inc.;
P.B. Development, Inc.;
Border Properties, Inc.;
Heritage Endeavors, Inc.;
Moresco, Inc.;
A.K. Memphis Properties, Inc.;
Foster Center Properties, Inc.;
TVCC California, A California Corporation;
Salt Lake International Center;
Triad Center;
Triad Entertainment Company;
Triad Handcart Marketplace;
Triad Theater Company;
Triad Trolley Corporation;
Triad Executive Centers;
Triad Real Estate Corporation;
Triad Utah;
Triad Energy Corporation;
Newedge;

Edgington Oil Company, Inc.;

Triad Aviation;

Triad America Services Corporation;

Triad Center Systems Corporation;

Triad Security Company;

Triad Service Company;

Triad Development Corporation;

Triad Food & Beverage Operation;

Triad/LaCaille Carriage Associates;

Triad/LaCaille Devereaux Associates;

Trison Distributing, Inc.;

Hercules Oil Company of San Diego, Inc.;

Sahuaro Petroleum and Asphalt Company;

Edgington Management Services, Inc.;

International Airmotive, Inc.;

Palace Hotel;

Slurry Seal of Arizona;

Dunn Enterprises, Inc.;

Slurry Seal of New Mexico;

L.A. Mar Industries, Inc.;

Highway and Road Products Company, Inc.;

Edgington Oil Limited;

Triad Financial Services; and

Triad Colorado Properties Corporation.

8. TAC is the parent corporation of Edgington and all the other entities listed in paragraphs 2 through 7, above. During all relevant times, TAC owned or controlled, either directly or indirectly, at least 51% of the voting stock of Edgington and all the other entities listed in paragraphs 2 through 7, above. *Declaration of Wayne Elggren ("Elggren Declaration")*, ¶ 3f–3k.

9. At all relevant times, TAC was owned and controlled by Adnan and Essam Khashoggi ("Khashoggis") through Triad International Corporation, a Cayman Island Corporation ("TIC") which was owned and controlled by Adnan Khashoggi, and through ELK, a Cayman Island Corporation ("ELK") which was owned and controlled by Essam Khashoggi. During the relevant periods, TIC held a 90% interest in TAC (reduced to 80% in 1984), while ELK owned a 10% interest (increased to 20% in 1984). *Declaration of Emanuel A. Floor ("Floor Declaration")*, ¶ 3.

10. Until June 1983, the principal activity of TAC was the development of United States based real estate holdings for the benefit of the Khashoggis. Though prior to Edgington becoming a member of the Triad Group TAC was not directly engaged in the petroleum business, either Adnan Khashoggi or Essam Khashoggi, or both, indirectly owned a 50% interest in Oasis Petroleum Corporation ("Oasis"), a California corporation engaged in the business of buying, refining and selling crude oil and refined petroleum products and gasoline. *Floor Declaration, ¶¶ 4, 5; Declaration of Tariq Kadri ("Kadri Declaration")*, ¶¶ 2, 5.

11. In early 1983, the TAC Board of Directors ("TAC Board") and the Khashoggis determined that TAC should directly engage in the petroleum industry. The expansion of TAC's business activity into the petroleum industry was based on Essam Khashoggi's involvement with Oasis and on the Khashoggis' belief that a petroleum-related concern would benefit from their connection with the Saudi Arabian royal family and the Khashoggis' expertise and resources in the petroleum business.

12. Moreover the TAC Board felt that the purchase of a company involved in the petroleum industry would complement TAC's existing United States business operations. These operations included real estate developments held through members of the Triad Group. Many of these real estate developments were start-up projects which it was anticipated would take several years to fully mature, develop equity and generate cash flow. The TAC Board planned that the cash flow of the company to be purchased would enable TAC to fund the deficits generated by TAC's real estate operations until they became self-sufficient. Correspondingly, it was anticipated that as the Triad Group's real estate developments matured, their increasing equity base would provide collateral against which to borrow funds for use of the oil company and its related energy activities. Thus, the TAC Board decided to acquire Edgington. *See Floor Declaration, ¶ 6.*

13. Since 1942 until the sale of substantially all its assets in September 1988, Edgington had been a significant refiner and supplier of asphalt and other petroleum products in certain market areas. Edgington owned and operated a refinery in Long Beach, California, a large product distribution and storage terminal in Signal Hill, California, and over sixty miles of pipelines that interconnected these facilities with other petroleum-related facilities in Southern California. *Declaration of David G. Davidson ("Davidson Declaration")* ¶ 5.

14. Prior to June 1983, Edgington was owned by Pennsylvania Company ("Pennco"). To acquire and own Edgington, TAC, together with Los Angeles Steamship Company ("LASCO"), a California corporation, formed Khamsin, a California general partnership, of which TAC and LASCO where equal general partners. Khamsin in turn formed Newedge Acquisitions, a California corporation, to buy the shares of Edgington from ·Pennco and to help finance Edgington's initial capital. *Kadri Declaration,* ¶ 6. On June 1, 1983, Pennco sold the Edgington stock to Newedge Acquisitions in a leveraged buyout transaction. *Id.* ¶ 7.

15. The purchase price for Edgington was comprised, in part, of a $25 million down payment and $33 million representing an estimated payment for inventory and accounts receivable. The down payment was financed by the sale of Edgington's marine terminal to Champlin Oil Company and the settlement of a lawsuit brought by Edgington against Champlin Oil Company. The net working capital payment, which was finally determined to be $36 million, was financed by Edgington from excess funds it borrowed. *Kadri Declaration,* ¶ 7.

16. The balance of the purchase price was comprised of a promissory note in the original principal amount of $8 million, executed by Edgington in favor of Pennco. This note was guaranteed by Edgington's subsidiary, Sahuaro Petroleum and Asphalt Company, an Arizona corporation, and the guarantee itself was secured by a deed of trust encumbering certain real property owned by Sahuaro. In addition, the note was secured by a deed of trust encumbering Edgington's refinery. *Kadri Declaration,* ¶ 10.

17. Immediately upon Newedge Acquisitions' purchase of the stock of Edgington, Khamsin was dissolved and its 100 shares in Newedge Acquisitions distributed equally between LASCO and TAC. Pursuant to an agreement for the purchase and sale of stock made "as of" June 1, 1983 and effective as of the same date, LASCO sold an additional 30 shares in Newedge Acquisitions to TAC. Thus, as of June 1, 1983 TAC owned 80% of Newedge Acquisitions and LASCO owned the remaining 20%. *Kadri Declaration,* ¶¶ 12 & 13.

18. Following its acquisition of Edgington through Newedge Acquisitions, and in furtherance of its business expansion policy the TAC Board in September 1983 reorganized TAC and its subsidiaries along functional lines. The purpose of this September 1983 reorganization was to more effectively manage each of TAC's existing or anticipated areas of business activity. As part of this reorganization, TAC created Triad Energy Corporation, a Utah corporation ("TEC"), as a wholly owned subsidiary. TAC then vested in TEC its then 80% interest in Newedge Acquisitions, the direct parent of Edgington. *Kadri Declaration,* ¶ 14; *Floor Declaration,* ¶ 7.

19. Although the executive, administrative and support functions for TAC and its subsidiaries had always been centralized in Salt Lake City, Utah, the September 1983 corporate reorganization formalized the pre-existing *de facto* arrangement by establishing an entity known as Triad Management Corporation, a Utah corporation ("TMC"), to employ the individuals performing the above described functions on behalf of TAC and the other Triad Group members. *Floor Declaration,* ¶ 8.

20. TAC's subsidiaries proliferated over the years, especially after the 1983 corporate reorganization. However, the TAC management, the TAC Board and TAC's ultimate shareholders always viewed TAC's activities, including those in the real estate and energy areas, and the corporations op-

erating in those areas, simply as "divisions" of one unified business. All internal organization, reports and budgets also reflected the unified business approach. *Floor Declaration,* ¶ 9.

21. In or about April, 1984, Newedge Acquisitions merged into Newedge, a Utah corporation. For convenience, Newedge Acquisition and Newedge will be referred to hereafter as "Newedge." *Kadri Declaration,* ¶ 15.

22. Following Edgington's acquisition by Newedge, there were extensive intercompany financing, intercompany transfers of funds and other financial relationships among the Triad Group members. For instance, in or about June 1983, Newedge borrowed approximately $15 million from the Executive Life Insurance Company ("Executive Life"). In return, Newedge issued to Executive Life a promissory note which was guaranteed by a bond issued by The Aetna Casualty and Surety Company ("Aetna"). In October, 1984 TAC executed an indemnity agreement in favor of Aetna. Approximately $8 million of this $15 million loan was ultimately disbursed to Edgington. Edgington used these proceeds in its day-to-day operations. The balance was disbursed to Newedge, Pacific Associates, Oasis and LASCO. Thus, through the efforts of Newedge and TAC, Edgington received over 50% of the proceeds from a major loan. This loan would not have been available to Edgington standing alone. *Floor Declaration,* ¶ 10; *Kadri Declaration,* ¶¶ 17, 18; *Elggren Declaration,* ¶ 3a; *Declaration of Mark G. Newgard ("Newgard Declaration"),* ¶ 4;

23. Another example of intercompany financial accommodations involved the payments to Executive Life and Aetna. Newedge's promissory note to Executive Life required semi-annual interest payments only, commencing on December 1, 1983, with the repayment of principal and all accrued but unpaid interest due on June 1, 1988. Apart from possibly the first such payments, Newedge never used any part of its own funds to make payments on the note. Rather, Newedge made all or almost all of the semi-annual interest payments on

the note with funds supplied by Edgington. Similarly, Newedge was obligated to make premium payments to Aetna with respect to the bond issued in favor of Executive Life. Again, except for perhaps the first such payments, Newedge made all or almost all of the premium payments with moneys furnished by Edgington. The interest payment on the note and the premium payments on the bond were treated by Edgington as advances to its parent corporations. *Kadri Declaration,* ¶ 18; *Newgard Declaration,* ¶ 4.

24. Another illustration of intercompany cash transfers relates to the First Boston Loan. In February 1984, Edgington borrowed $18 million from First Boston Corporation ("First Boston") and immediately upstreamed that amount to Newedge. Newedge then disbursed approximately $500,000 to Edgington to cover certain fees that were incurred in connection with placing this loan. Newedge retained approximately $12,000 from the proceeds of this loan and disbursed the balance to TAC, Pacific Associates, N.V., Oasis, and Hong Kong and Shanghai Banking Corporation. *Elggren Declaration,* ¶ 3b.

25. Moreover, on numerous occasions Edgington transferred monies to or for the benefit of the Triad Group and/or its ultimate shareholders. Through these transfers, including those discussed above, Edgington advanced to Newedge, its parents and affiliates, an aggregate sum of $89.6 million. *Elggren Declaration,* ¶ 3c.

26. Another instance of intercompany financial transactions involved the Getty oil contract. Oasis had entered into a supply contract agreement with Getty Oil Company ("Getty") for the purchase of a certain monthly volume of crude oil. From about April, 1984 to about May, 1985, Oasis resold the Getty oil it purchased to its subsidiary, Paramount Petroleum Corporation ("Paramount"). TAC and three other members of the Triad Group, Salt Lake International Center ("SLIC"), Triad Center and Triad Plaza Development Company, executed guarantees in favor of various banks that had lent moneys to Paramount. Through these guarantees, these four enti-

ties guaranteed Oasis' performance of its obligations to deliver oil to Paramount. In return for guaranteeing the Getty oil contract, Oasis permitted TAC to administer and control the daily payment received from Paramount for the sale of the oil and the monthly disbursements made to Getty. Although Paramount made daily payments to Oasis for the Getty oil it received, Oasis was not obligated to make payments to Getty until the 20th day of the following month. Thus, at any given time, Oasis enjoyed a "float" between the daily payments made by Paramount and the monthly payments it made to Getty. This float was kept in a bank account ("Getty Account") in the name of TAC at First Interstate Bank in Los Angeles, California. Edgington administered and managed the Getty Account for the benefit of TAC. At the direction of TAC, the "float" was used by Edgington to cover cash flow shortages and to avoid the need to borrow money or draw on lines of credit from third parties. Thus, in the one year period during which TAC controlled the Getty contract "float," Edgington drew approximately $61.6 million through numerous transactions, and at month's end it returned some or all the funds to the Getty Account. *Kadri Declaration,* ¶¶ 19–23; *Floor Declaration,* ¶ 14; *Elggren Declaration,* ¶ 3d.

27. Another example of intercompany transfer of funds occurred in 1985 when TAC and Triad America International, an affiliate of TAC, advanced almost $11.5 million to Edgington. *Elggren Declaration,* ¶ 3e.

28. In addition to intercompany transfer of funds, there was extensive cross-collateralization, cross-guaranteeing and cross-indemnification between Edgington and the other Triad Group members. For example, in or about June 1983, Edgington entered into a revolving credit agreement with General Electric Credit Corporation ("GECC"). Pursuant to this agreement, Edgington had the ability to borrow up to approximately $70 million from GECC. Newedge executed the GECC loan agreement as a co-maker, and in essence as a guarantor of the obligations of Edgington to GECC. In addition, LASCO and TAC, through the

general partnership Khamsim, executed for the benefit of GECC an Income Maintenance Agreement whereby Khamsin, and ultimately LASCO and TAC, were required to advance funds to Edgington in the event that Edgington sustained specified cumulative losses over certain specified periods. *Kadri Declaration,* ¶¶ 7 & 8.

29. As additional collateral for Edgington's obligations under the GECC $70 million line of credit, TAC arranged for First Security Bank of Utah ("FSB") to issue a $10 million letter of credit (the "FSB Letter of Credit") in favor of GECC. FSB had previously made a series of loans to various Triad Group members doing business in Utah, including TAC, Triad Utah, and SLIC, but had no preexisting business relationship with Edgington. TAC and A.K. Houston Properties, Inc., another member of the Triad Group, applied for the FSB Letter of Credit whereby they agreed to reimburse FSB for any sums drawn by GECC against the FSB Letter of Credit. These obligations of TAC and A.K. Houston Properties, Inc., to FSB were collateralized by a deed of trust encumbering certain real property located in Texas owned by a subsidiary or subsidiaries of Triad Properties Corporation. *Kadri Declaration,* ¶ 11.

30. Examples of cross-indemnification are also abundant. For instance, the $18 million First Boston loan discussed in paragraph 24, above, was secured by another bond issued by Aetna in favor of First Boston. The approximate principal amount of the bond was $21 million. TAC agreed to indemnify Aetna for any and all losses it might sustain arising out of this bond. Without this indemnification agreement from TAC, Edgington would have been unable to secure this loan from First Boston. *Floor Declaration,* ¶¶ 11–12; *Kadri Declaration,* ¶ 26; *Newgard Declaration,* ¶ 12.

31. In addition to the bonds issued with respect to the Executive Life note and the First Boston loan, Aetna issued at least 20 other bonds (collectively "Aetna/Edgington Bonds") for the benefit of Edgington in favor of various state and federal agencies and third-party creditors. The Aetna/Edgington Bonds had an aggregate lia-

bility in excess of $12 million. TAC and Newedge agreed to indemnify Aetna for any and all losses it might sustain with respect to the Aetna/Edgington bonds. *Floor Declaration,* ¶ 13. *See also Newgard Declaration,* ¶ 13.

32. Another example of cross-indemnification among the Triad Group members is TAC's agreement to indemnify the directors and various key employees of Edgington from any losses or liabilities which they might incur while acting within the scope of their employment. *Kadri Declaration,* ¶ 25.

33. Similarly, evidence of cross-guaranteeing among Triad Group members is abundant. For instance, in 1985 Edgington borrowed approximately $5 million from Community Bank. Repayment of that obligation was guaranteed by TAC. *Newgard Declaration,* ¶ 14; *Kadri Declaration,* ¶ 27.

34. Another example of cross-guaranteeing (and cross-collateralization) is shown by the FSB loans. FSB extended a letter of credit for the benefit of, among others, Newedge. FSB had lent substantial sums to TAC, Salt Lake International Center and another Triad Group member, Triad Utah. As of January, 1987, the Triad Group owed FSB approximately $17 million in all of its loans (collectively "FSB Loans"), of which approximately $15 million represented debts relating to unpaid loans made to TAC, Salt Lake International Center/Triad Utah Corporation. The FSB loans were extensively cross-collateralized and cross-guaranteed by Edgington, Newedge, TEC, TAC, Salt Lake International Center, Triad Utah Corporation, A.K. Houston Properties, Inc. and other Triad Group members, and were secured by a pledge of a portion of TAC's shareholder interest in TEC, TEC's shareholder interest in Newedge, and Newedge's assignment of, and a security interest in, a portion of the proceeds from the sale of Edgington's shares. *Declaration of Mark D. Howell ("Howell Declaration"),* ¶¶ 3–5; *Declaration of Lawrence R. Haggerty ("Haggerty Declaration")* ¶¶ 3, 4; *Plaintiff's Exhibits* 16–25.

35. Zions' First National Bank of Utah ("Zions") also made loans to Triad Properties Corporation, SLIC and Triad Center. The Triad Properties Corporation loan was guaranteed by TAC. The loan to SLIC was guaranteed by Triad Properties Corporation. By 1986, the loans made by Zions were in default. Zions was informed that its loans would be paid with the proceeds from the sale of Edgington or from the sale of certain real estate holdings belonging to various Triad Group members. In this connection, Zions was given a security interest on the proceeds of the sale of Edgington's assets or stocks. *Declaration of Thomas C. Swegle,* ¶¶ 3–5.

36. By 1987, all the FSB and Zion loans were in default. The obligations of the Triad Group arising out of the FSB and Zions loans were settled pursuant to the FSB/Zions settlement agreement entered into in September, 1988 by and among Newedge, TAC, Edgington, FSB, First Security Mortgage Company, Triad Properties Corporation, Triad Associates, SLIC, Triad Center, TEC, A.K. Florida Properties, N.V. and Zions. Under the settlement agreement, FSB received an allowed claim in the TAC bankruptcy estate and received $4.8 million generated from the 1988 sale of Edgington's assets. Zions, in turn, received an allowed general unsecured claim in the TAC bankruptcy estate and approximately $800,000 in cash for the sale of Edgington's assets in September, 1988. *Declaration of R. Todd Neilson,* ¶ 3(a).

37. The Triad Group perceived itself and operated as a single, unitary business. The TAC management, the TAC Board and TAC's ultimate shareholders always viewed TAC's activities, including those in the real estate and energy areas, and the corporations operating in those areas, simply as "divisions" of one unified entity. *Floor Declaration,* ¶ 9.

38. Not only did the Triad Group operate as an integrated business entity, it was perceived as such by its creditors and other third parties. For instance, the very structure of the GECC revolving line of credit demonstrates that GECC was looking to the credit worthiness of not only Edgington

but TAC, other Triad Group members and TAC's ultimate shareholders. *See also Plaintiff's Exhibit* 26.

39. Aetna, too, viewed the Triad Group as a single, unitary entity. For instance, in a letter from Aetna's underwriting agent with reference to the bonds issued for the benefit of Edgington, Newedge, Oasis and Handlingair, the beneficiaries were described as the "Oasis [sic]—Triad" Group and the letter speaks of Aetna requiring indemnities to cover all bonds written for "the group." *Kadri Declaration,* ¶ 28; Exhibit 27.

40. When Edgington and other members of the Triad Group sought loans or extensions of credit from third parties, they typically presented the consolidated audited financial statements for Edgington and the other members of the Triad Group. Moreover, the audited, consolidated financial statements for TAC and all of its subsidiaries (including Edgington) for 1983 and 1984 were distributed to the Triad Group's major creditors. *Floor Declaration,* ¶ 21.

41. FSB, Zions, and First Interstate Bank of Utah ("FIB") made their credit decisions to extend loans to the various Triad Group members based, at least in part, on consolidated financial statements for TAC and/or the entire Triad Group, the reputed wealth of TAC's ultimate shareholders, the Khashoggis, and direct or indirect representations that the Khashoggis had committed to contributing significant sums of money to the Triad Group over a period of time. *Declaration of Kenneth W. Bell ("Bell Declaration"),* ¶ 4; *Swegle Declaration,* ¶ 3; *Haggerty Declaration,* ¶ 4.

42. In or about November 1983, FIB approved the increased renewal of an $8 million (at that time $6 million) secured loan to Triad Center (another Triad Group member—*Elggren Declaration,* ¶¶ 5g–5k) for land acquisition, planning and continuation of the building of the proposed Triad Center and a $6 million loan to TAC for working capital. An important consideration in this decision was that Edgington had become a part of TAC. *See Bell Declaration,* ¶ 2. Similarly, in or about September 1984, FIB approved a $2 million short-term unsecured loan to TAC. The bank, in extending this loan, relied to a significant degree upon TAC's indirect ownership of Edgington, which it perceived as bringing diversification and profitability to TAC. *See Bell Declaration,* ¶ 3. Significantly, one of the potential sources of repayment of this short-term loan was the daily receipts from Edgington. *Id.*

43. TIC and ELK, the shareholders of TAC, also looked to the entire Triad Group in deciding whether to contribute funds to TAC. On or about December 31, 1984, TIC, ELK and TAC entered into a Stock Subscription Agreement. Pursuant to the stock subscription agreement TIC and ELK agreed to contribute $150 million to TAC over a five year period beginning December 1, 1985, in return for additional stock from TAC. The amount that TIC and ELK would contribute under the stock subscription agreement was determined with reference to the operating budgets of Edgington and the other Triad Group members. *Floor Declaration,* ¶ 15.

44. The Triad Group conveyed a public image of unity not only to the financial institutions discussed above but to the public in general. In particular, a corporate logo was used on the letterheads of TAC and all of its subsidiaries, including Edgington, identifying each as "A Triad America Company." Moreover, TAC's publicity booklets, press releases and other public relations releases systematically presented TAC as the head of the United States businesses of the Khashoggis and identified TAC's various subsidiaries, including Edgington, as divisions or areas of operation within one unified company. *Floor Declaration,* ¶¶ 16, 17.

45: A number of the various functions and services provided for the benefit of the Triad Group members was centralized. For instance, Edgington and the other Triad Group members shared external accounting and tax planning services as well as internal accounting services. Similarly, there were occasions when Edgington and various other Triad Group members shared the same outside and in-house counsel.

Moreover, the Triad Group, including Edgington, employed the same marketing and public relations firm. *Floor Declaration,* ¶¶ 16, 18, 19, 20 and 22; *Kadri Declaration,* ¶ 29; *Newgard Declaration,* ¶ 7.

46. The TAC Board and TAC's president made most important decisions on behalf of Edgington and the other Triad Group members. The TAC Board actively participated in the affairs of all the Triad Group members, including those of Edgington. For instance, all major policy decisions concerning the Triad Group members, including Edgington, were made or approved by the TAC Board. Moreover, the heads of the various Triad Group members, including Edgington officers and directors, regularly attended the TAC board of director meetings. At these meetings, Edgington personnel, as well as the heads of the other Triad Group entities, gave presentations and made reports to the TAC Board. Further, at the time Newedge purchased Edgington, Edgington was unprofitable. It was the combined skills and management of the Edgington, Newedge, TEC and TAC boards of directors that helped eventually to restore Edgington to profitability. Moreover, the TAC board regularly reviewed and approved annual budgets and financial statements of all Triad Group members, including Edgington and its subsidiaries, as well as the bonuses of the key executives of the Triad Group, including Edgington and its subsidiaries. *Floor Declaration,* ¶ 24; *Kadri Declaration,* ¶¶ 31, 32; *Newgard Declaration,* ¶¶ 7, 8.

47. There was also a substantial overlap among the directors of Edgington, Newedge, TEC, TAC and TAC's other subsidiaries. Until approximately September, 1987, there was a member of the TAC Board on the board of directors of Edgington. This director was frequently a director of many other Triad Group corporations, including those in the real estate business. Similarly, during this period there was extensive overlapping of officers. Again, officers of TAC held offices with Edgington, Newedge and TEC, as well as in many other Triad Group corporations, including those engaged in real estate and other activities.

*See Floor Declaration,* ¶ 2; *Kadri Declaration,* ¶ 4; *Newgard Declaration,* ¶ 3; *Declaration of Philip G. Studarus,* ¶¶ 3, 4.

48. During the relevant periods the various Triad Group members shared know-how and expertise. For instance, Tariq Kadri and Emanuel Floor, both officers and directors of TAC, rendered various consulting services to certain Triad Group members. In addition, during the approximate period from April 1986 to August 1986, when many of the Triad Group loans were in default, Archie Humphrey, Edgington's chief financial officer, was, at TAC's request, at the TAC offices in Salt Lake City, Utah, to negotiate on TAC's behalf with FSB, Zions, FIB and various other lenders to forestall foreclosure until the Triad Group had an opportunity to sell Edgington or its assets and thereby generate sufficient cash with which to pay the Triad Group's delinquent loans. Other examples of intercompany sharing of expertise include Edgington's management of the Getty "float" and Mark G. Newgard's efforts to sell Edgington to pay obligations incurred by other Triad Group members. *Kadri Declaration,* ¶ 30; *Floor Declaration,* ¶ 23; *Newgard Declaration,* ¶ 16; *Swegle Declaration,* ¶ 5; *Bell Declaration,* ¶ 5.

49. On November 12, 1987, Edgington and Sulphur Mountain Oil Corporation, a California corporation ("SMOC") entered into an asset purchase agreement pursuant to which Edgington agreed to sell, and SMOC agreed to buy, substantially all of the assets of Edgington. By order entered March 25, 1988, this Court authorized Davidson, the former Chapter 11 Trustee of Newedge, to vote the shares of Edgington in favor of the sale of the Edgington assets to SMOC, and on September 1, 1988, Edgington sold substantially all of its assets to SMOC. On December 7, 1988, the Court confirmed the Trustee's First Amended Plan of Reorganization ("Plan"). On December 27, 1988, the "Effective Date" of the Plan, Edgington merged into Newedge and R. Todd Neilson, the Chapter 11 trustee of TAC became Newedge's Suc-

374

cessor Trustee. *Davidson Declaration,* ¶¶ 4, 7, 8 & 9; *Neilson Declaration,* ¶ 2.

50. Any conclusion of law, or part thereof, deemed to be an uncontroverted fact is hereby incorporated as an uncontroverted fact.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction of the parties and has subject matter jurisdiction over this adversary proceeding. 11 U.S.C. § 505.

2. Affiliated corporations generating income both within and without California are subject to the California Franchise Tax on the net income apportionable to California. Section 25101 of the California Revenue and Taxation Code provides in pertinent part:

> When the income of a taxpayer is subject to the tax imposed under this part as derived from or attributable to sources both within and without the state the tax shall be measured by the net income derived from or attributable to sources within the state....

If the affiliated corporations are engaged in a unitary business, they must combine their incomes for apportionment purposes. *Edison California Stores, Inc. v. McColgan,* 30 Cal.2d 472, 183 P.2d 16 (1947); *Standard Register Company v. Franchise Tax Board,* 259 Cal.App.2d 125, 137, 66 Cal.Rptr. 803 (1968).

3. Courts have developed two general tests to determine whether a group of affiliated entities is engaged in a unitary business. The first of these tests is the "three unities" test. The California Supreme Court in *Butler Brothers v. McColgan,* 17 Cal.2d 664, 678, 111 P.2d 334 (1941), *aff'd,* 315 U.S. 501, 62 S.Ct. 701, 86 L.Ed. 991 (1942) held that the unitary nature of a business is "definitely established" by the presence of the three unities: (1) unity of ownership; (2) unity of operation; and (3) unity of use. The evidence is simply overwhelming that during the period at issue Edgington and the other Triad Group members identified in paragraphs 2–7 of the Statement of Uncontroverted Facts, respec-

tively, comprised during each particular tax year at issue "unitary business" under the criteria established by *Butler Brothers* and its progeny.

4. The first element—unity of ownership—is met. During all relevant periods TAC owned or controlled, either directly or indirectly, 51% or more of the voting stock of Edgington and the other Triad Group members identified in paragraphs 2 through 7 of the Statement of Uncontroverted Facts, above. Cal.Rev. Tax.Code § 25105 ("Direct or indirect ownership or control of more than 50% of the voting stock of the taxpayer shall constitute ownership or control for the purposes of this article.")

5. The second of the three unities test, unity of operation, is also met. This requirement relates to staff functions. *Chase Brass & Copper Company v. Franchise Tax Board,* 10 Cal.App.3d 496, 502, 95 Cal.Rptr. 805 (1970). Courts have considered various factors in determining the existence of unity of operation, although the presence or absence of any one factor does not decide whether unity of operation exists. *E.g. Container Corporation of America v. Franchise Tax Board,* 117 Cal. App.3d 988, 995, 173 Cal.Rptr. 121, 126 (1981).

6. A crucial factor in determining whether unity of operation exists is the extent to which related companies are dependent upon each other for internal or third-party financing. *See Anaconda Company v. Franchise Tax Board,* 130 Cal.App.3d 15, 26, 181 Cal.Rptr. 640 (1982); *Container Corporation of America, supra,* 117 Cal.App.3d at 996, 173 Cal.Rptr. 121.

7. The existence of intercompany loans, intercompany cash transfers and intercompany financial accommodations is an important indication of unity of operation. *See Chase Brass & Copper Company v. Franchise Tax Board, supra,* 10 Cal.App.3d at 503, 95 Cal.Rptr. 805 (loans to subsidiary, in the amount of $10 million, constitute "substantial evidence of unity of operation".). The uncontroverted facts dis-

cussed above amply demonstrate the existence of this factor.

8. The existence of agreements pursuant to which a related entity agrees to collateralize, guarantee, or indemnify third parties with respect to loans made to a related entity or entities is convincing evidence of the unitary nature of the related entities' combined business. *See Container Corporation of America v. Franchise Tax Board, supra,* 117 Cal.App.3d at 996, 173 Cal.Rptr. 121; *Anaconda Company v. Franchise Tax Board, supra,* 130 Cal. App.3d at 26, 181 Cal.Rptr. 640. In the course of dealings and the historic relationship between Edgington and the other Triad Group members is replete with instances where Edgington has assisted another member or members of Triad Group in connection with third-party loans, and vice versa.

9. Another factor demonstrating unity of operation is evidence that the unitary group perceives itself and holds itself out as an integrated business. *See, e.g., Container Corporation of America v. Franchise Tax Board, supra,* 117 Cal.App.3d at 999–1000, 173 Cal.Rptr. 121; *Standard Register Company v. Franchise Tax Board, supra,* 259 Cal.App.2d at 135, 66 Cal.Rptr. 803. This factor also exists. The evidence demonstrates that Edgington, TAC and other members of the Triad Group always held themselves out as members of one integrated group. Moreover, in making their credit decisions, GECC, Aetna, FSB, Zions and FIB generally looked at the Triad Group as a whole. Thus, there is abundant evidence establishing this factor, as well.

10. The centralizing of various functions and services for the benefit of the affiliated companies is further evidence of the unitary nature of the group. *See, e.g., Honolulu Oil Corporation v. Franchise Tax Board,* 60 Cal.2d 417, 423, 34 Cal.Rptr. 552, 386 P.2d 40 (1963). The uncontroverted evidence demonstrates numerous instances where Edgington and the other Triad Group members shared the same internal organization to perform administrative and support functions, and shared the same external consultants and professionals.

11. The motivation of a parent for purchasing a subsidiary is also relevant in determining the existence of a unitary business. *See generally Standard Register Company v. Franchise Tax Board, supra,* 259 Cal.App.2d at 135 (¶ 1), 66 Cal.Rptr. 803. The evidence demonstrates that Edgington was purchased in order to expand TAC's business operations into the petroleum industry. Moreover, the TAC Board expected that Edgington's ability to provide cash would inject needed capital into TAC's real estate projects until the developments became self-sufficient and income generating. *See generally id.* (¶ 2). Conversely, the TAC Board anticipated that as the real estate development projects matured, they would provide collateral against which to borrow funds on behalf of Edgington and TAC's other petroleum related activities. These purposes underlying TAC's decision to acquire Edgington further point toward unity.

12. The third of the three unities test is unity of use. This element relates to interlocking executive forces and operational systems, *Chase Brass & Copper Company v. Franchise Tax Board, supra,* 10 Cal.App.3d at 504, 95 Cal.Rptr. 805, and to some degree overlaps with unity of operation, *see id.,* at 502, 95 Cal.Rptr. 805; *Container Corporation of America v. Franchise Tax Board, supra,* 117 Cal. App.3d at 999, 173 Cal.Rptr. 121. As with unity of operation, the evidence overwhelmingly supports a finding of unity of use among Edgington and the other Triad Group members.

13. Perhaps the most significant factor in determining the existence of unity of use among related entities is whether the parent company determines "major policy matters" for its subsidiaries or affiliates. *See, e.g., Chase Brass & Copper Company v. Franchise Tax Board, supra,* 10 Cal. App.3d at 504, 95 Cal.Rptr. 805 ("The 'major policy matters' are what count in our estimation of integration."). The evidence overwhelmingly establishes that the TAC Board and TAC's president made most im-

portant policy decisions on behalf of Edgington and the other Triad Group members.

14. Interlocking officerships and directorships are exceedingly important indications of a unity of use. *See, e.g., Chase Brass & Copper Company v. Franchise Tax Board, supra,* 10 Cal.App.3d at 504, 95 Cal.Rptr. 805 ("The integration of executive forces is an element of exceeding importance."); *Container Corporation of America v. Franchise Tax Board, supra,* 117 Cal.App.3d at 998, 173 Cal.Rptr. 121 ("The integration of major executive functions is a factor of great importance pointing toward unity."). As discussed above, there was a considerable integration of executive forces between Edgington and the other Triad Group members as evidenced by the substantial overlap of officers and directors of Edgington and the other Triad Group members. *Neilson Declaration,* ¶ 3; *Davidson Declaration,* ¶ 10. Indeed, plaintiff, the TAC trustee, is now also the Successor Trustee of Newedge.

15. The TAC Board regularly reviewed and approved the annual budgets and financial statements of Edgington and the other Triad Group members. These facts are also significant in finding a unitary business relationship between parent and subsidiary. *See, e.g., Container Corporation of America v. Franchise Tax Board, supra,* 117 Cal.App.3d at 998, 173 Cal.Rptr. 121; *Anaconda Company v. Franchise Tax Board, supra,* 130 Cal.App.3d at 27, 181 Cal.Rptr. 640; *Standard Register Company v. Franchise Tax Board, supra,* 259 Cal.App.2d at 136 (¶ 12), 66 Cal.Rptr. 803.

16. Another element in establishing unity of use is the sharing of expertise among members of a related group. *E.g., Anaconda Company v. Franchise Tax Board, supra,* 130 Cal.App.3d at 26, 181 Cal.Rptr. 640; *Container Corporation of America v. Franchise Tax Board, supra,* 117 Cal.App.3d at 999, 173 Cal.Rptr. 121. *See also Standard Register Company v. Franchise Tax Board, supra,* 259 Cal.App.2d at 136 (¶ 10), 66 Cal.Rptr. 803. The evidence establishes the existence of this factor as well.

17. The TAC Board reviewed and approved the salaries and year-end bonuses of Edgington's key executives. This control over the salaries and bonuses of Edgington's key executives further evinces unity of use. *See Chase Brass & Copper Company v. Franchise Tax Board, supra,* 10 Cal.App.3d at 504, 95 Cal.Rptr. 805.

18. The evidence is overwhelming that the three unities tests is met. Thus, the Court concludes that Edgington and the other Triad Group members identified in paragraphs 2 through 7, respectively, of the Statement of Uncontroverted Facts, above, were during each particular tax year at issue engaged in a unitary business.

19. As an alternate to the three unities test, some courts use the dependency/contribution test. *E.g., Edison California Stores, Inc. v. McColgan, supra,* 30 Cal.2d 472, 183 P.2d 16. This test requires a determination whether the operation of the portion of the business within California is dependent upon or contributes to the operation of the business without the state. *Edison California Stores, Inc. v. McColgan, supra,* 30 Cal.2d at 481, 183 P.2d 16. If the in-state operations are dependent upon or contribute to the out-of-state operations, they are unitary. *Id.* However, it is not necessary that the operations within and without California be "necessary and essential" to each other and to the functioning of the business as a whole. *Superior Oil Company v. Franchise Tax Board,* 60 Cal.2d 406, 34 Cal.Rptr. 545, 386 P.2d 33 (1963). It is sufficient if an affiliated group member contributes to the advantages of a unitary enterprise. *Id.* 60 Cal.2d at 414, 34 Cal.Rptr. 545, 386 P.2d 33.

20. The evidence that establishes the existence of the "three unities" demonstrates with equal force that the contribution/dependency test is also satisfied. Edgington depended upon contributions of the other Triad Group members, and the Triad Group members depended upon Edgington's contributions. Alternatively, both Edgington and the other members of the Triad Group contributed significantly to each other's operations.

21. Therefore, plaintiff's motion for partial summary judgment will be granted.

22. Any statement of uncontroverted fact, or part thereof, deemed to be a conclusion of law is hereby incorporated as a conclusion of law.

## PARTIAL SUMMARY JUDGMENT IN FAVOR OF PLAINTIFF R. TODD NEILSON

Based on the Court's Statement of Uncontroverted Facts and Conclusions of Law filed in this adversary proceeding,

IT IS ORDERED, DECREED, AND ADJUDGED:

1. That the 1983 California Corporation Franchise Or Income Tax Return (Form 100) filed by Newedge Acquisition Inc. with defendant State of California, Franchise Tax Board ("FTB") as a combined report of a unitary group correctly included Edgington Oil Company, Inc., later known as Oldedge, Inc. ("Edgington") and its subsidiaries on the said 1983 combined report; that neither Newedge Acquisition Inc. nor any of the entities included in the said 1983 combined report owes any tax, penalties or interest to the FTB for tax year 1983; and that Newedge Acquisition Inc. and the other entities included in the said 1983 combined report are entitled to a $129,755.00 credit for overpayment of tax for tax year 1983.

2. That the 1984 California Amended Corporation Franchise Or Income Tax Return (Form 100X) filed by Triad America Corporation and Subsidiaries with the FTB as a combined report of a unitary group correctly included Edgington and its subsidiaries on the said 1984 combined report; that neither Triad America Corporation nor any of the other entities included in the said 1984 combined report owes any tax, penalties or interest to the FTB for 1984; and that Triad America Corporation and the other entities included in the said 1984 combined report are entitled to a $64,553.00 refund for tax year 1984.

3. That the 1985 California Corporation Franchise Or Income Tax Return (Form 100) filed by Triad America Corporation and Subsidiaries with the FTB as a combined report of a unitary group correctly included Edgington and its subsidiaries in the said 1985 combined report; that neither Triad America Corporation nor any of the other entities included in the said 1985 combined report owes any tax, penalties or interest to the FTB for tax year 1985; and that Triad America Corporation and the other entities included in the said 1985 combined report are entitled to a $416,660.00 credit for overpayment of tax for tax year 1985.

4. That the 1986 California Corporation Franchise Or Income Tax Return (Form 100) filed by Triad America Corporation and Subsidiaries with the FTB as a combined report of a unitary group correctly included Edgington and its subsidiaries in the said 1986 combined report; that the said 1986 combined report correctly reported a tax in the total amount of $557.00 for tax year 1986; and that since that sum has been paid in full to the FTB neither Triad America Corporation nor any of the other entities included in the said 1986 combined report owes any tax, penalties or interest to the FTB for tax year 1986.

5. That the 1987 California Corporation Franchise Or Income Tax Return filed by Triad America Corporation and Subsidiaries with the FTB as a combined report correctly included Edgington and its subsidiaries in the said 1987 combined report; that the said 1987 combined report correctly reported the total amount of tax, penalties and interest of $862.00 for 1987; that since the said tax, penalties and interest have been paid in full to the FTB neither Triad America Corporation nor any of the other entities included in the said 1987 combined report owes any tax, penalties or interest to the FTB for tax year 1987; and that this determination of the tax, penalties and interest for 1987 shall be without prejudice to Triad America Corporation and the other entities included in the said 1987 combined report filing an amended 1987 combined report.

6. That the following affiliated corporations are subject to the provisions of the Bank and Corporation Tax Law and may

properly be included in a combined report filed by Triad America Corporation with the FTB for tax year 1988:

N111EK Corporation;
American Capital Aviation Corporation;
Mark III Leasing Company;
Triad International;
Triad Management Corporation;
Triad Property Management Corporation;
Triad Telecommunications, Inc.;
Triad Properties Corporation;
Triad Condas Corporation;
A.K. Houston Properties, Inc.;
L T Properties, Inc.;
P B Development, Inc.;
Border Properties, Inc.;
Heritage Endeavors, Inc.;
Moresco, Inc.;
A K Memphis Properties, Inc.;
Foster Center Properties, Inc.;
TVCC California, A California Corporation;
Salt Lake International Center;
Triad Center;
Triad Entertainment Company;
Triad Handcart Marketplace;
Triad Theatre Company;
Triad Trolley Corporation;
Triad Executive Centers;
Triad Real Estate Corporation;
Triad Utah;
Triad Energy Corporation;
Newedge;
Edgington
Triad Aviation;
Triad America Services Corporation;
Triad Center Systems Corporation;
Triad Security Company;
Triad Service Company;
Triad Development Corporation;
Triad Food & Beverage Operation;
Triad/LaCaille Carriage Associates;
Triad/LaCaille Devereaux Associates;
Trison Distributing, Inc.
Hercules Oil Company of San Diego, Inc.;
Sahuaro Petroleum & Asphalt Company;
Edgington Management Services, Inc.;
International Airmotive, Inc.;
Palace Hotel; ·
Slurry Seal of Arizona;
Dunn Enterprises, Inc.;
Slurry Seal of New Mexico;
L.A. Mar Industries, Inc.;
Highway & Road Products Company, Inc.;
Edgington Oil Limited;
Triad Financial Services;
Triad Colorado Properties Corporation.

7. That plaintiff R. Todd Neilson shall recover his costs of action from defendant FTB.